UNITED STATES of America, Appellee,

v.

Scott FAUL, Appellant.

UNITED STATES of America, Appellee,

v.

Yorie Von KAHL, Appellant.

UNITED STATES of America, Appellee,

v.

David Ronald BROER a/k/a David Ronald Brewer, Appellant.

Nos. 83–1912 to 83–1914.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1984.

Decided Nov. 7, 1984.

Rehearings Denied Jan. 3, 1985.

Lay, Chief Judge, filed dissenting opinion.

Warren C. Sogard, Fargo, N.D., Irvin B. Nodland and Ralph A. Vinje, Bismarck, N.D., for appellant.

Lynn E. Crooks, Asst. U.S. Atty., Fargo, N.D., for appellee.

Before LAY, Chief Judge, ROSS and FAGG, Circuit Judges.

ROSS, Circuit Judge.

The appellants, Scott Faul, Yorie Kahl and David Broer were indicted by a grand jury for their involvement in a shootout that occurred on February 13, 1983, on the outskirts of Medina, North Dakota. Two U.S. Marshals were killed during the incident, and one injured. One county sheriff and one city police officer were also injured.

Faul and Kahl were each charged with two counts of first degree murder; four counts of assaulting United States Marshals and other law enforcement officers assisting them; one count of conspiring to assault; and one count of harboring and concealing a fugitive. The jury found them not guilty of first degree murder, but guilty of the lesser included offense of

second degree murder, and guilty of the remaining charges.

Broer was not indicted for murder, but was indicted on the assault, conspiracy, and harboring charges. He was acquitted of the substantive assault charges, but was convicted on the conspiracy and harboring counts.

The district court [1] imposed identical sentences on Faul and Kahl; two concurrent life terms for the second degree murder convictions, and concurrent ten year sentences on each of the four assault charges to run consecutively with the life terms. Both appellants were also given a five year consecutive sentence for the harboring offense, and a five year term, to run concurrently with all other terms, on the conspiracy charge. Broer was given two consecutive five year terms for the harboring and conspiracy offenses. The defendants appeal their convictions pursuant to 28 U.S.C. § 1291 (West Supp.1984). For the reasons stated herein we affirm the convictions.

## I. FACTS

The events that led to the convictions of the appellants are essentially as follows: In 1977 Gordon Kahl was convicted on two counts of failing to file income tax returns. After a period of incarceration he was placed on probation. In July of 1980 he was summoned to appear in federal court on a probation violation charge, but refused to do so. A warrant was subsequently issued, followed by several unsuccessful attempts to arrest Kahl.

On February 10, 1983, an all points police bulletin was issued throughout North Dakota based upon information that Gordon Kahl was headed toward Minot, North Dakota. The bulletin described a vehicle which belonged to Scott Faul, although he was not specifically named. The essence of the bulletin was that a federal warrant was outstanding for Kahl's arrest, and that he was wanted by the United States Marshals Service.

On Sunday, February 13, 1983, Gordon Kahl, Scott Faul, Yorie Kahl, David Broer and others assembled at the Medina Medical Clinic in Medina, North Dakota. Shortly before 3:00 p.m., Stutsman County Deputy Sheriff Bradley Kapp, who was aware of the all points bulletin and knew Kahl's identity, observed a vehicle at the clinic which he believed to be associated with Kahl. Kapp informed the Deputy United States Marshal of his belief that Kahl was attending a meeting at the clinic. Kapp was requested by the Deputy Marshal to keep the clinic under surveillance. Arrangements were made for Deputy Marshals Robert Cheshire and James Hopson, from Bismarck, to meet with Marshal Kenneth Muir and Deputy Marshal Carl Wigglesworth, from Fargo, at Medina.

While waiting for the teams of marshals to arrive, Kapp kept the clinic under surveillance. Late in the afternoon Gordon Kahl, Scott Faul, Yorie Kahl and Joan Kahl left the clinic. Kapp observed them come out the north door and enter the Kahls' Chrysler station wagon, which was parked on the north side of the clinic. At that time Gordon Kahl was wearing a blue baseball cap and a bright blue windbreaker. The three men in the group all had weapons which Kapp believed to be Ruger mini-14s, which are .223 caliber rifles. Yorie Kahl pointed in Kapp's direction so as to give the impression that the surveillance had been detected. After a short time Faul and the Kahls went back into the clinic. Shortly thereafter, they came out of the clinic and moved the Kahl vehicle out of Kapp's view.

A discussion took place in the clinic involving Gordon Kahl, Scott Faul, Yorie Kahl, David Broer and others as to what should be done. David Broer decided to call Police Chief Graf and make inquiries of him concerning the all points bulletin which he had learned of from Graf two days earlier. Two separate phone calls were made by Broer to Graf, and the contents of the all points bulletin were confirmed.

1. The Honorable Paul A. Benson, Chief Judge, United States District Court, District of North Dakota.

Someone then suggested that the surveillance of the clinic should be tested. It was decided that Yorie Kahl and his father, Gordon, should change clothing. Yorie put on his father's blue windbreaker and Gordon put on his son's brown ski jacket. When the group was ready to leave, David Broer suggested that Gordon Kahl should leave in Broer's vehicle. Vernon Wegner, who had come to the meeting with Broer, was instructed by Broer to ride in the Kahl Chrysler station wagon.

Shortly before the vehicles left the clinic the marshals from Bismarck and Fargo met in Medina. It was decided that Marshal Muir and Deputy Marshal Wigglesworth would go north of town to set up a roadblock, and that Deputy Marshals Cheshire and Hopson would meet up with Kapp.

The Broer vehicle left the clinic first with Broer driving and Gordon Kahl as a passenger. The Kahl vehicle followed with Yorie Kahl driving, Joan Kahl in the front seat, Scott Faul and Vernon Wegner in the rear. Both vehicles proceeded in a westerly direction through town and turned north toward where the marshals had set up their roadblock.

As the vehicles crested a small hill immediately outside of Medina, they observed the marshals' roadblock. Officer Schnable, a local law enforcement officer, had already activated the red light on top of his vehicle. Both subject vehicles pulled into a driveway. Marshal Muir saw the vehicles pull into the driveway and by radio alerted Deputy Marshal Cheshire, who had not yet crested the top of the hill. Muir and Schnable began moving their vehicles toward the defendants' vehicles. At about the same time Cheshire activated a flashing red light on the dash of his car. Broer attempted to back out of the driveway and return south, but was cut off by Cheshire.

Yorie Kahl and Scott Faul immediately got out of their car with mini-14 rifles and pointed them at the marshals. Yorie Kahl ran to a utility pole fifty to sixty feet away. Gordon Kahl likewise immediately got out of Broer's vehicle with his mini-14 rifle and

pointed it at the officers. Almost simultaneously Deputies Cheshire and Hopson got out of their car and told the defendants to lay down their guns. Shortly after the initial stop the marshals announced that they were there to arrest Gordon Kahl.

After remaining beside the Kahl station wagon for two or three minutes, Scott Faul ran toward a mobile home, approximately 150 feet away. Marshal Hopson radioed to Muir that Faul was running toward the mobile home. Marshal Wigglesworth then left the Muir vehicle and ran into the pasture in an attempt to head off Faul.

Marshal Hopson again announced that they were there to arrest Gordon Kahl. Someone shouted "Look out behind you" and seconds later the shooting started. Kapp and others testified that the first shot came from the direction of Yorie Kahl by the utility pole. Kapp stated that this shot hit Cheshire; he could see blood on Cheshire's chest. Kapp actually saw Yorie Kahl fire the second shot. Kapp immediately returned fire at Yorie Kahl with his shotgun. He believed he missed him on the first shot but hit him on a later shot. Before Marshal Muir was killed he also fired at and hit Yorie Kahl. Kapp testified that he was turning in the direction of Gordon Kahl when he himself was shot.

Shortly before the shooting started, Deputy Marshal Wigglesworth confronted Faul at a distance of approximately 100 yards behind the mobile home, announced he was a United States Marshal, and ordered Faul to throw down his rifle. Instead, Faul returned to the corner of the mobile home and began firing. Six shell casings were found at the corner of the mobile home which matched Scott Faul's rifle.

During a momentary lull in the firing three people in the mobile home looked out the window and saw Scott Faul run from the mobile home to the utility pole where Yorie Kahl was lying injured. These witnesses observed both Scott Faul and Gordon Kahl aim their rifles at the fleeing Bradley Kapp. They saw Scott Faul assisting Yorie Kahl back toward the vehicles. They then observed a man approach Che-

shire and fire two shots at him at point-blank range. Although the witnesses initially identified Faul as the executioner, it was subsequently determined that he had not fired the shots, and that in all likelihood, Gordon Kahl had executed Marshal Cheshire.

Meanwhile, Scott Faul assisted in loading Yorie Kahl into Officer Schnable's police car. Faul left the scene in the police car, followed by Gordon Kahl and his wife in the Kahl Chrysler station wagon, and Broer and Wegner in Broer's vehicle. The evidence showed that Broer did not participate in the shootout. The confrontation lasted approximately ten minutes; the total time of the shooting was estimated as taking less than one minute.

Scott Faul and Gordon Kahl returned to the clinic to seek medical attention for Yorie Kahl. Kapp was also taken to the clinic for medical attention. After a brief confrontation, Faul and Gordon Kahl left the clinic in Officer Schnable's police car. Broer and Wegner turned themselves in later that evening. Scott Faul turned himself in the next day. Gordon Kahl remained a fugitive until June 3, 1983, when he was killed in a confrontation with federal law enforcement officers near Smithsville, Arkansas.[2]

## II. ISSUES

The appellants allege that the following errors were committed at trial: 1) They did not receive a fair trial due to the district court judge's refusal to recuse himself, failure to change venue in light of the trial publicity, and his denial of their motions for separate trials; and 2) Yorie Kahl's handgun, Exhibit 104, was improperly admitted.

Additionally, Yorie Kahl claims that the district court erred in denying his motion to suppress the statements he made to the FBI while in the hospital. Defendant Faul alleges prosecutorial misconduct. Broer asserts that the court 1) erred in denying his motion to suppress the shotgun found in his home because the search warrant was overly broad; 2) erred in allowing the jury to be sequestered under the care of the Marshals Service; 3) erred in permitting FBI Agent Brubaker to assist the prosecution; and 4) erred in sentencing him under the felony provision of 18 U.S.C. § 1071. Broer also claims that the evidence was insufficient to support the verdict against him.

## III. DISCUSSION

### A. Recusal Request

The defendants requested that Chief Judge Benson recuse himself from the case. They alleged that the judge could not be impartial because he had a professional or personal relationship with the deceased United States Marshals.

■ 28 U.S.C. §§ 144 and 455 govern the disqualification of judges. Section 144 provides for recusal of a district court judge where a legally sufficient affidavit is timely filed which demonstrates a personal bias or prejudice of the judge. Section 455 provides for disqualification where a judge's impartiality might reasonably be questioned or he has a personal bias or prejudice. As grounds for disqualification set out in the statutes are quite similar, both may be considered together. *See Gilbert v. City of Little Rock,* 722 F.2d 1390, 1399 (8th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984); *Phillips v. Joint Legislative Committee,* 637 F.2d 1014, 1019 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982).

■ The statutory requirements must be complied with before a judge can be disqualified. *United States v. Anderson,* 433 F.2d 856, 859 (8th Cir.1970). Relief under section 144 is expressly conditioned on the timely filing of a legally sufficient affidavit. *Id.* When an affidavit does not meet the requirements imposed by law, the judge should not disqualify himself. *See Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investi-*

---

**2.** The events surrounding the ultimate apprehension and death of Gordon Kahl are dis-

cussed in detail in *United States v. Udey,* 748 F.2d 1231 (8th Cir. 1984).

*gation,* 507 F.2d 1281, 1285–86 (8th Cir. 1974); *Anderson, supra,* 433 F.2d at 860. To be legally sufficient, an affidavit must allege bias or prejudice, and such "bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). *See Phillips, supra,* 637 F.2d at 1020.

■ In this case the affidavits allege that the judge could not be impartial because of the deceased marshals' contact with the court. Assuming that the deceased marshals did have contact with the court by providing security, it does not follow that the judge had a "professional or personal relationship" with either marshal sufficient to demonstrate personal prejudice bias, or an inability to be impartial. The affidavits are not legally sufficient under section 144, and they do not raise a reasonable question as to the judge's impartiality under section 455. *See Davis v. Commissioner,* 734 F.2d 1302 (8th Cir.1984). They contain conclusory allegations of bias or prejudice without sufficient factual support for the conclusions reached. The defendants cite numerous rulings at trial as evidence of the court's bias. This evidence fails to establish the requisite "extrajudicial" bias. *See Anderson, supra,* 433 F.2d at 860. Accordingly, the district court judge did not abuse his discretion in refusing to recuse himself. *See Gilbert, supra,* 722 F.2d at 1399; *Phillips, supra,* 637 F.2d at 1021; *United States v. Equifax, Inc.,* 557 F.2d 456, 464 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978).

## B. Change of Venue

The appellants contend that they were denied a fair trial by the district court's refusal to grant their motion for a change of venue in light of the extensive prejudicial pretrial publicity in this case. The

court initially withheld ruling on the motion pending the completion of *voir dire,* but subsequently proceeded with trial, thereby implicitly denying their motion.[3]

■ It is fundamental that the tenets of due process require a trial before a fair and impartial tribunal. *See United States v. McNally,* 485 F.2d 398, 402 (8th Cir.1973), *cert. denied,* 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974). Federal Rule of Criminal Procedure 21(a) embodies this concept with respect to motions for a change of venue. In pertinent part the rule provides:

> The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

FED.R.CRIM.P. 21(a). We must initially determine whether this case falls within the category of cases wherein the publicity so pervaded the proceedings as to give rise to a presumption of prejudice against the defendant. *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

Appellants rely on *Rideau, Estes,* and *Sheppard* to support their position that the publicity in North Dakota was so pervasive that they could not receive a fair trial in that state. We believe that these cases are inapposite.

The factual circumstances involved in *Rideau, Estes,* and *Sheppard,* were summarized by the Supreme Court in the following manner:

> Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were held. In

---

**3.** The defendants renewed their motion for a change of venue at the completion of *voir dire,* but no formal ruling was made on the motion by the district court.

those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In *Rideau* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"—the real trial had occurred when tens of thousands of people, in a community of 150,-000, had seen and heard the defendant admit his guilt before the cameras.

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. *Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). The circumstances present in those cases are clearly absent here.

The media coverage in this case was widespread. Between February 14, 1983, and March 29, 1983, 68 stories appeared in the North Dakota Forum newspaper which were directly, or tangentially, related to the

Medina shootout. However, the focus of many of those articles was on the subsequent nationwide manhunt for Gordon Kahl. The stories that did pertain to the shootout were largely factual in nature.[4] Clearly we must distinguish between largely factual publicity and that which is invidious or inflammatory. *See Murphy, supra,* 421 U.S. at 800–01 n. 4, 95 S.Ct. at 2036 n. 4. While the media coverage in this case was thorough, it was on the whole objective; it did not even remotely approach that proscribed by the Supreme Court in the cases relied upon by the appellants.

▮ As we previously stated, unless pretrial publicity is pervasive and prejudicial, it will not, in and of itself, be grounds for a change of venue, *see McNally, supra,* 485 F.2d at 403, nor, standing alone, does it presumptively deprive a defendant of due process. *See Murphy, supra,* 421 U.S. at 799, 95 S.Ct. at 2035. Absent such a presumption, "[t]he proper test is whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *McNally, supra,* 485 F.2d at 403, *quoting Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). It is our duty as an appellate court to independently examine the *voir dire* testimony "to determine whether an impartial jury was selected, thus obviating the necessity for a change of venue." *McNally, supra,* 485 F.2d at 403.

▮ In *Murphy, supra,* 421 U.S. 794, 95 S.Ct. 2031, the Supreme Court made it clear that an accused is entitled to an impartial jury, however, the Court also noted

**4.** Two of the articles were potentially prejudicial to the defendants. One article's caption read: **"Yorie Kahl may have fired first shot in bloody shootout"**; and the other caption read: **"Faul accused of 'executing' deputy marshal."** Initially we note that the government subsequently abandoned the theory that Faul had executed Marshal Cheshire, and that was not an issue in the trial. Furthermore the article said that Faul was "accused" of executing the marshal, not that he "did in fact" execute the marshal. Similarly, the first article's caption indi-

cated that Yorie Kahl "may have" fired the first shot, not that he "did" fire the first shot. We do not believe that these articles created the "pervasive" prejudicial atmosphere necessary to warrant reversal. *Cf. United States v. Blanton,* 719 F.2d 815, 818 (6th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984) (fair trial where record contained 240 articles adverse to the defendants). Finally, it should not go without mention that some of the articles actually characterized Gordon Kahl and the Posse Comitatus group as heroes.

that a juror is presumed to be impartial. The Court stated:

> The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S., at 722, 81 S.Ct. at 1642. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
>
> > "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut *the presumption of a prospective juror's impartiality* would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, at 723.
>
> At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and *it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Ibid.*

421 U.S. at 799–800, 95 S.Ct. at 2035–36 (emphasis added). The appellants claim that the *voir dire* proceedings clearly demonstrated the prejudice they incurred as a result of the pretrial publicity. Having carefully reviewed the *voir dire* transcript, we must reject the appellants' claim.

One hundred fourteen venirepersons were selected in this case, 28 of which were initially excused on the basis of hardship, as was one other later in the proceeding. Seventy-eight prospective jurors were eventually questioned. Of these, 9 were excused peremptorily by the prosecution, and 16 by the defense. Thirty-nine were excused because they could not be impartial, although only 21 of these 39 based their partiality on the media coverage.[5] The remaining 14 served as the jury and 2 alternates. The appellants claim that 50% of the panel questioned indicated partiality because of their exposure to media accounts, evincing the lack of a fair trial in this case.

First we note that while 50% of the prospective jurors questioned did indicate partiality, only 27% attributed their inability to be impartial to the media's coverage of the case. In *Murphy*, 78 jurors were questioned; 30 were excused for miscellaneous reasons, 20 peremptorily and 20 by the court for having prejudged the defendant. 421 U.S. at 796, 95 S.Ct. at 2034. Despite the fact that 26%—20 of 78—of the venirepersons were prejudiced against the defendant, the Court held that this "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* at 803, 95 S.Ct. at 2037.[6] Here, 39 of 78 eligible jurors were excluded as potentially being partial. We do not believe that the number of venirepersons excluded for being partial gives rise to the conclusion the appellants' assert. *Compare Irvin, supra,* 366 U.S. 717, 727, 81 S.Ct. 1639, 1645 (prejudice shown where 268—90% of those questioned on the point—believed the accused guilty) *with United States v. Blanton,* 719 F.2d 815, 820 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984) (70 out of 92 venirepersons excused was not reflective of prejudice).[7]

The district court took several steps to insure the impartiality of the jurors actual-

---

**5.** It is unclear whether the partiality was favorable or detrimental to the defendants. As stated previously, while some of the media coverage depicted the group as "tax fanatics," they were also characterized as "heroes."

**6.** We note that in *Murphy* the excluded jurors were clearly prejudiced against the defendants. As we stated above no such determination can be made here.

**7.** While the dissent characterizes our use of the relevant statistics in this case as "misleading," *post,* at 1215 n. 8, we do not agree with that characterization. We have acknowledged that 50% of the venirepersons finally questioned were excused as being partial. We are simply not persuaded that this figure demonstrates a "poisoned" community with hostile sentiments toward the defendants. *See supra,* notes 5 & 6, and accompanying text.

ly selected. One hundred fourteen venirepersons were selected in this case, a substantially larger jury pool than is utilized in most cases. Additionally, the defendants were granted 16 peremptory challenges as opposed to the normal 10. *See Blanton, supra,* 719 F.2d at 824. Furthermore, the trial judge took great care during the *voir dire* proceedings to ensure that an impartial jury was selected. The following excerpts from the *voir dire* proceeding serve to exemplify the care taken by the trial judge.

[COURT] The parties to the lawsuit are entitled to have the case tried to a jury that is impartial.

An impartial jury is a jury where each individual juror is without bias of any kind and is fair and objective. An impartial jury is also one who is willing and able to return a verdict solely on the evidence presented at this trial in this courtroom and the law applicable to that evidence as I will give it to you in my instructions at the end of the trial.

An impartial jury must be able to disregard and set aside all prejudice, sympathy, ideas, notions or beliefs about the law or the case which they have previously encountered. An impartial jury must be able to set aside and disregard anything they may have previously heard or read about the case before coming into the courtroom this morning. In other words, as I have previously mentioned, an impartial jury is a jury composed of 12 impartial jurors who are willing and able to render a verdict based solely on the evidence and the law as it is presented in this courtroom during this trial. And if a person has heard or read something about the case before being called as a juror, that person would not be qualified to serve as a juror in the case unless she or he was able and willing to set aside and disregard anything that he or she may have heard or read about the case before coming into court. If he or she has formed an opinion about the case before being called as a juror, that perspective jury [sic] would not be qualified to serve as a juror in the case

unless he or she could in good conscious [sic] be able and willing to set aside the opinion formed and not form another opinion until after he or she has heard all the evidence and the law in the case as it has been presented to the jury during the trial in this courtroom and after the case has been submitted to the jury for its deliberation and its verdict.

\* \* \* \* \* \*

I'm now going to proceed and question each of you individually and [there] will be a series of questions I will ask each of you individually and I ask those of you who have to sit and listen [to] \* \* \* simply be patient. It's something that must be done. \* \* \* And I again remind you this must be done because the law requires that a fair and impartial juror be selected for the trial of a case of this kind or a case of any kind, criminal case and civil case for that matter.

Subsequently, when questioning a prospective juror the following colloquy occurred:

[COURT] Has anything that you have heard or read about this case before coming into court caused you to form an opinion as to the innocence or guilt of any of the defendants in the case?

[JUROR] I know I'd have to hear both sides before I could do that, before I could form an opinion.

[COURT] Then are you telling me then that you have not formed an opinion?

[JUROR] I have not formed an opinion.

[COURT] As to the innocence or guilt of any of the defendants in this case?

[JUROR] Or guilt. Yes.

[COURT] Has anything that you have heard or read about this case before coming into court caused you to form an opinion as to evidence in the case?

[JUROR] No.

[COURT] If you were selected as a juror in this case, would you be willing and able to set aside and disregard anything that you may have seen or heard about the case prior to coming into court and set aside and disregard any opinions,

ideas, notions or beliefs about the case and would you be able to form and render a judgment based solely on the evidence and the law presented in this courtroom during this trial?

[JUROR] I feel that I can set aside any rumors I may have heard at one time or another.

[COURT] Excuse me. I'll interrupt you. Could you set aside anything, I'm not talking now about rumors, can you set aside and disregard anything that you may have previously read or heard about this case through the news media, for example?

[JUROR] Yes, I know I can.

[COURT] You know you can do that?

[JUROR] Yes.

[COURT] And could you, if you were selected as a juror in the case, would you render a verdict based solely on the evidence and the law presented in this courtroom during this trial and set aside all other considerations, notions, ideas or beliefs about the case?

[JUROR] I feel I could do that.

[COURT] And would you be willing to do that?

[JUROR] Yes. I'd be willing.

[COURT] Is there anything that you may have heard or read about this case which would make it difficult for you to sit as a juror in the case?

[JUROR] I can't think of any.

On the second day of *voir dire* the court again explained the importance of juror impartiality:

The jury panel is advised * * *, and you've already been told, that one of the duties of a juror is to follow the law as stated by the court, the law which the Court will give you, the law that's appli-

cable to the charge, [the court] will give you the law that's applicable to the evidence in the case and it is the responsibility and duty of the jurors to follow that law and to set aside and disregard any other notions, ideas or believes [sic] about the law that they may have previously encountered. And I mention that again because that is a part of the responsibility of a fair and impartial juror so that you'll fully and completely understand what I mean when I ask whether or not something is going to interfere with your ability to be a fair and impartial juror. Of course, the other part of that is * * * the decision of the jury in the case as to each individual defendant is going to have to be based on the evidence that is presented in this courtroom during this trial and the law that is applicable to that evidence, and then the lawyers will make their arguments and the case will be submitted to you on that basis.

In addition to calling a substantial number of venirepersons, increasing the number of peremptory challenges, emphasizing the importance of impartiality, and questioning each prospective juror individually, the district court sequestered the jury to prevent exposure to media publicity during the trial. While additional measures could have been taken, we believe the measures taken were sufficient to produce an impartial jury. *See United States v. Bliss,* 735 F.2d 294 (8th Cir.1984).

We cannot say that the pretrial publicity was so extensive, or that the examination of the prospective jurors revealed such prejudice, that the court erred in accepting the selected jurors' assurances of impartiality.[8] *See Beck v. Washington,* 369 U.S.

---

**8.** The characterization in the dissent that the general populace of the District of North Dakota somehow lost their fairmindedness as a result of the media coverage in this case is not supported by the record. *See post,* at 1230. On the contrary, an examination of the voir dire transcript reveals that those jurors who had formed opinions in the case readily admitted that they lacked the ability to be impartial. The jurors actually selected were unequivocal as to their ability to be impartial; the *record* shows that 39

of the 78 venire persons actually questioned were clearly impartial. The *record* does not support the conclusion drawn by the dissent.

Finally, we have considered the "other factors" outlined by the dissent, *see post,* at 1225–26, and we remain convinced that the defendants received a fair trial. For example, the voir dire transcript discloses that none of the jurors selected were familiar with the individuals involved in the trial; the shootout occurred in

541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962). We believe, under the circumstances presented in this case, that petitioner received a fair trial. The appellants have "failed to show that the setting of the trial was inherently prejudicial or that the jury-selection process * * * permits an inference of actual prejudice." *Murphy, supra,* 421 U.S. at 803, 95 S.Ct. at 2037.[9]

**C. Severance**

The appellants allege that they were prejudiced by the district court's denial of their motions for severance. Broer claims that he was prejudiced because of the evidence surrounding the shootout in which he did not partake. Faul claims that he retreated from the scene immediately upon the commencement of the confrontation and, therefore, his theory of defense was different than that of his codefendants and they should not have been jointly tried. Yorie Kahl claims that there was evidence

February 1983 with the majority of the media coverage occurring shortly thereafter—the trial did not take place until May; the jurors represented a cross section of the entire state and were not selected exclusively from the Medina area; and, finally, there was nothing to indicate that the jurors selected were prejudiced by their exposure to media coverage of the case.

9. In his dissent Chief Judge Lay observes that this court's evaluation of a denied change of venue request in a federal prosecution is based on the exercise of our supervisory power to formulate and apply proper standards for the enforcement of the criminal law in federal courts. *Post,* at 1224. He also recognizes that there are no "clear guidelines for evaluating prejudice in a federal prosecution." *Post,* at 1224. Nonetheless, we are criticized for applying the criterion previously employed by the Supreme Court in a host of cases from *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), to *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), because those cases did not involve federal prosecutions. This is not, however, the first time this court has used the criterion established in *Irvin* and its progeny, in the context of a federal prosecution. *See United States v. McNally,* 485 F.2d 398 (8th Cir.1973). *See also United States v. Bliss,* 735 F.2d 294, 298–300 (8th Cir.1984) (*Murphy*-type analysis applied to change of venue denial in federal prosecution). *Accord United States v. Blanton,* 719 F.2d 815, 831–32 (6th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984). There is no reason we should not continue to do so. *The key is to*

that none of the bullets from his gun harmed anyone, and therefore he should not have been tried with the other defendants.

██ It is well established that motions to sever are addressed to the sound discretion of the district court, and a denial of severance, absent a showing of clear prejudice and an abuse of discretion, is not a ground for reversal. *See United States v. Brim,* 630 F.2d 1307, 1310 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981); *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 236 (1977). Before the refusal to sever may be deemed an abuse of discretion, the defendant must affirmatively demonstrate that his right to a fair trial has been prejudiced. *Jackson, supra,* 549 F.2d at 524.

*assure that the defendants were tried by an impartial jury.* The totality of the circumstances lead us to believe that the defendants in this case received a fair trial before an impartial jury; therefore, the district court did not err in failing to grant the request for a change of venue. Unlike the dissent here, we are not persuaded that Chief Justice Burger's concurring opinion in *Murphy,* 421 U.S. at 803–04, 95 S.Ct. at 2037–38, or Justice Clark's dissent in *Rideau v. Louisiana,* 373 U.S. 723, 728, 83 S.Ct. 1417, 1420, 10 L.Ed.2d 663 (1963), require that this case be reversed in the exercise of our "supervisory power." *Post,* 1224 n. 1. On the contrary, we decline to exercise that power in this case.

Additionally, it is significant to note that while the dissent states that the defendants were "peacefully assembled," *post,* at 1226, they were heavily armed—the meeting was described by one person in attendance as being "emotionally charged." Designated Record (D.R.) at 142. Furthermore, as we read the record, the only person condemned by the editorials, *see post.* at 1227, was Gordon Kahl. *See* D.R. at 170, 232. Finally, while there was an article which indicated that the other defendants may have been members of the Posse Comitatus tax protest group, *see* D.R. at 145, the overwhelming majority of articles affiliated only Gordon Kahl with the group. *See* D.R. at 168, 170, 173, 176–78. In our opinion the record does not support the allegation that there was widespread "hostility against the defendants," or that "[a]nger * * * spread across the entire District of North Dakota." *Post,* at 1227.

■ "It is the general rule that persons charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." *Jackson, supra*, 549 F.2d at 523. Severance is not required merely because the evidence against one defendant is more damaging than the evidence against another. *Id.* at 525. "Severance becomes necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants." *Id.*

■ In this case the defendants failed to meet this heavy burden. Initially the defendants argue that their individual defenses differed. This assertion standing alone does not affirmatively demonstrate any prejudice requiring reversal. *See United States v. Roth*, 736 F.2d 1222 (8th Cir.1984). Here the indictment had carefully compartmentalized the evidence against each of the defendants. There was no attempt in the indictment to charge all defendants with identical offenses thereby leaving it to the jury to determine each individual's culpability. There was no danger, for example, that Broer, who took no direct part in the shooting, would be convicted of murder, because he was not charged with murder. The jury in this case could be expected to compartmentalize the evidence as it related to each of the defendants, and, therefore, no prejudice has been shown. *See Jackson*, 549 F.2d at 525. Furthermore, most of the evidence offered by the government was admissible against each of the defendants either because it directly implicated them in a crime for which they were charged, or because it was *res gestae. See United States v. Caspers*, 736 F.2d 1246 (8th Cir.1984).

## D. Admissibility of Exhibit 104

At trial, the defendants testified that Yorie Kahl was shot in the handle of his pistol with what sounded like a .38 or .357 magnum. Their apparent theory was that the first shot was fired by Marshal Muir, the only person who actually used a pistol that day, and that they returned fire in self-defense. The gun was not found after the shooting, although the wooden grip from the gun had been found and was admitted into evidence. Shortly before the end of Kahl's jury argument, the government was informed that the gun had been found. An *in camera* conference was held in which Yorie Kahl identified the pistol as his own. Faced with an obvious attempt by an unknown individual, or group of individuals, to manipulate the trial, the district court judge sought to gain agreement from the parties as to how to proceed with respect to the gun.

■ With some trepidation the government agreed to admit the gun without challenging the chain of custody or foundation. The government was willing to stipulate that the bullet lodged in the handle was not a .223 round, but would not stipulate to the bullet being a .38 caliber as requested by counsel for Yorie Kahl. At that time counsel for Scott Faul made a motion for a mistrial, in which Kahl's attorney joined. Broer's attorney did not object to the admission of this evidence.[10] Counsel for Kahl claimed that the ballistics stipulation would further buttress the testimony of Kahl and Faul regarding their theory of the case, as well as their overall credibility as witnesses. The court requested the parties to assume that he would deny the motions for mistrial, and asked them to suggest how the trial should proceed given the denial.

Thereafter, Kahl's attorney, and counsel for the government, agreed that the government would offer the gun into evidence with an explanatory statement as to the circumstances surrounding its discovery. The parties stipulated that the gun was Yorie Kahl's, and the jury was to be allowed to have a .223 live round for

---

**10.** As to appellant Broer, we do not believe that he has properly preserved this issue for appeal because of his failure to object. Where the admission of evidence is not objected to at trial the issue is not properly preserved for appeal and will not be grounds for reversal unless plain error has occurred. *See United States·v. Vitale*, 728 F.2d 1090, 1092 (8th Cir.1984).

comparison purposes. Counsel for Scott Faul renewed his motion for a mistrial, and the district court denied the motion.

Counsel for the government then told the jury how the gun was discovered, and offered it into evidence conceding that it was Yorie Kahl's gun and that the bullet embedded in the handle was not a .223 round. Counsel for Joan Kahl then explained to the jury that he was going to comment about the gun on behalf of Kahl and Faul, as their attorneys had already completed their closing arguments. He explained how the evidence corroborated the testimony previously given by the defendants, and that the bullet embedded in the handle had most likely come from Marshal Muir's .38, as it clearly was not a .223.

The appellants claim that the government was allowed to use the pistol in closing argument while they were not, and that this failure to allow "cross-examination" of the evidence, coupled with the lack of proper foundation, substantially prejudiced their defenses.

■■■■■ Questions relating to the introduction of additional evidence after the parties have rested are entrusted to the sound discretion of the district court. *See United States v. Dossey,* 558 F.2d 1336, 1339 (8th Cir.1977); *United States v. Webb,* 533 F.2d 391, 395 (8th Cir.1976). In determining whether an abuse of discretion occurred, the relevant factors to consider are "whether the evidence caused surprise to the defendant, whether he was given adequate opportunity to meet the proof, and whether the evidence was more detrimental to him because of the order in which it was introduced." *Webb, supra,* 533 F.2d at 395.

■■ Here, the defendants were not surprised, as the testimony at trial, elicited from the defendants, established the existence of the gun. Furthermore, several days before the gun was discovered Faul's attorney received an anonymous tip regarding the location of the gun. While all involved may have been surprised that the gun turned up, none of the appellants were unaware of the gun's existence nor were they unfairly surprised by its discovery and admission into evidence.

Appellants had ample opportunity to meet the proof. Mr. Ramlo, counsel for Joan Kahl, made an extensive argument to the jury explaining how the additional evidence buttressed the appellants' earlier testimony. The appellants contend that the trial should have been recessed, or a mistrial declared, so that a ballistics test could be performed on the bullet lodged in the gun's handle. While a ballistics examination may have further buttressed the appellants' theory in the case, its absence was not prejudicial in the sense that absent the ballistics test the evidence somehow inculpated them. Rather it appears that this evidence was favorable to the defendants even absent a ballistics examination. Additionally, as we noted above, the government conceded that the bullet was not a .223 round, and Mr. Ramlo argued to the jury that the bullet was a .38 round, therefore, the defendants' theory, although not supported by ballistics evidence, was submitted to the jury.

Finally, although the government offered the gun into evidence, Mr. Ramlo did argue on behalf of the defendants prior to the government's presentation of its closing argument, and, therefore, the order in which the gun was introduced was of no consequence. *See Webb, supra,* 533 F.2d at 395.

We are convinced, based upon our review of the record, that the defendants were not prejudiced by the admission of Exhibit 104. The gun did not prove anything new in the trial; it served only to corroborate the testimony of the defendants. Faced with an obvious attempt at trial manipulation by an unknown source, the district court sought to minimize the prejudice to all of the parties involved. The procedures followed did not substantially prejudice the defendants, and no abuse of discretion occurred. *See Webb, supra,* 533 F.2d at 395.

### E. Motions to Suppress Evidence

#### a) Broer's Shotgun

Broer objects to the court's denial of his motion to suppress the shotgun found on

his farmstead, as he believes the gun was discovered pursuant to an overly broad search warrant. The warrant, which was supported by affidavits, authorized a search for the following items:

a. any and all firearms, ammunition, grenades, crossbows, rocket launchers and other explosive devices;

b. information on tax protest groups, or movements, including but not limited to posse comitatus materials, membership lists, meeting records and minutes; federal income tax filing kits; travel receipts, including credit card information;

c. United States Marshal Kenneth Muir's official credentials and .357 magnum revolver;

d. blood stained clothing, dressings, bedding, towels.

At the evidentiary hearing, Broer stipulated that he did not contest the warrant on lack of probable cause, nor on the basis that the search exceeded the scope of the warrant. His sole argument was that the warrant was overbroad on its face, and invalid as a matter of law. The government, accepting the stipulation, did not call witnesses or offer any additional evidence. The suppression motion was submitted to the district court to be decided on a question of law.

Without the benefit of this court's recent decisions in *United States v. LeBron,* 729 F.2d 533 (8th Cir.1984), and *United States v. Fitzgerald,* 724 F.2d 633 (8th Cir.1983) *(en banc ), cert. denied,* — U.S. ——, 104 S.Ct. 2151, 80 L.Ed.2d 538 (1984) the district court held that part (b) of the warrant was overly broad, but determined that the entire warrant was not invalid because part (b) could be severed. Subsequently, this court sitting *en banc* upheld the validity of the partial suppression-severance doctrine. *See Fitzgerald, supra,* 724 F.2d at 636–37. Accordingly, the district court's ruling on this matter will not be set aside.

On appeal, Broer claims that part (a) of the warrant was similarly overbroad, and therefore the shotgun was discovered under an invalid portion of the warrant and should have been suppressed. We disagree.

Clearly there was probable cause to believe that some of the guns used in the Medina shootout would be found on Broer's homestead, and the defendant stipulated as much. Part (a) of the warrant authorized a search for "any and all firearms" potentially connected with this shootout. We believe that the police were sufficiently guided in their search, so as to adequately protect Broer's rights. *See LeBron, supra,* 729 F.2d at 536.

Generally, courts approve otherwise valid warrants if they provide reasonable guidance to the exercise of informed discretion of the officer executing the warrant. *See LeBron, supra,* 729 F.2d at 536. This is true even when a particular description of the item to be seized cannot be given, and a generic class of items is approved. *See United States v. Dennis,* 625 F.2d 782, 792 (8th Cir.1980). The clause "any and all firearms" in this case, is distinguishable from the "any records * * * involving stolen property" clause that was struck down in *LeBron.*

In *LeBron* there was no means of distinguishing between stolen property and other property thereby guiding the officers in the execution of the warrant. The generic term "records" combined with the unidentifiable category of "stolen property" led the court to strike down the warrant which would have allowed the seizure of essentially anything in writing; personal documents, etc. Here the search for "firearms" provided a substantially narrower and identifiable category. While the term is arguably generic, it is much more limited in scope than the term "records."

The affidavit presented to the magistrate in support of the warrant application described the shooting confrontation. The "firearms" sought were related to the shootout. Arguably, all of the firearms seized were relevant until ballistics examinations had been performed. These factual circumstances were absent in *LeBron.* Despite the "any and all" language present

**1220**

in both cases we believe *LeBron* is inapposite.

Accordingly, we hold that part (a) of the warrant was not overly broad, and, therefore, the shotgun was discovered under a valid portion of the warrant. Therefore, the district court correctly denied appellant's motion to suppress.[11]

**b) Yorie Kahl's Statements**

■ Yorie Kahl was hospitalized with severe abdominal injuries sustained from a shotgun. He underwent surgery on February 13, 1983. On February 14, the defendant awoke and spoke to Sheriff Perleberg. Kahl was heavily sedated at that time. On February 16, at 6:00 a.m., Kahl requested to speak with Perleberg in order to tell his story. He was informed that he did not have to talk, but he chose to nonetheless. At 9:00 a.m. agents with the FBI visited Kahl, read him his *Miranda* rights and listened to his story. On the morning of February 21, the defendant asked to speak to the FBI agents. Kahl was again read his *Miranda* warnings and voluntarily spoke with the agents. The defendant was coherent and alert during both February 16 interviews, and the February 21 interview.

Following a suppression hearing the district court suppressed the statements made on the 14th, but admitted the other statements. The district court held:

> [T]he material statement allegedly made by defendant to Special Deputy Perleberg on the morning of February 14, the day following surgery, was made in response to "interrogation" without the benefit of a *Miranda* warning, and may not be used in the government's case in chief.

* * * * * *

The court further concludes the statements allegedly made to Perleberg on the morning of February 16 were voluntary and knowingly made by the defendant out of his personal desire to express himself and are not subject to suppression. As such, the absence of a *Miranda* warning does not affect their admissibility.

Defendant's statements to Special Agent Frost and others on February 16 and February 21 were also initiated by defendant and were made after being fully advised of his *Miranda* rights. The court concludes defendant's waiver of *Miranda* rights on each occasion was the product of a rational intellect and a free will, and that the statements were voluntarily and knowingly made, uninfluenced by coercion or medication and are not subject to suppression.

*United States v. Kahl,* Crim. No. C3–83–16–03, slip op. at 12 (D.N.D. May 4, 1983). We believe the district court was correct in denying Kahl's motion to suppress the February 16 and 21 statements.

First, the district court's factual determinations regarding the motion to suppress are subject to the clearly erroneous standard. *See United States v. McGlynn,* 671 F.2d 1140, 1143 (8th Cir.1982). Here the factual determinations were not clearly erroneous. Second, the totality of the circumstances indicate that the statements were a product of a "rational intellect and a free will." *United States v. Johnson,* 649 F.2d 617, 619 (8th Cir.1981). Accordingly, we find no error in the district court's denial of Kahl's motion to suppress.

**F. Prosecutorial Misconduct**

■ Prior to trial the government and counsel for Scott Faul reached an agreement which by its terms permitted Faul's

---

**11.** Even if the warrant was invalid, the Supreme Court's recent ruling in *United States v. Leon,* — U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would allow the admission of the shotgun evidence in this case. In *Leon* the Court held that the exclusionary rule should not be applied so as to bar the admission of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate which is ultimately found to be invalid. *Id.* 104 S.Ct. at 3419–21. *See also Massachusetts v. Sheppard,* — U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (same). In this case, even if the warrant was invalid, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable. Accordingly, without regard to the validity of the warrant, the shotgun was properly admitted.

statements to the government to be admitted into evidence without objection from the government, provided he took the witness stand subject to cross-examination.

At trial the government called Agent Aldridge to the stand as a rebuttal witness to contradict and show variances in the testimony Faul had given on direct examination. Faul was then recalled to the stand and the complete statement he had made to the FBI—the subject matter of the agreement in question—was offered into evidence as exhibit 132. Despite the agreement, the government objected to the receipt of the full report.

The government claims that it understood the agreement to be essentially as follows: a polygraph exam would be administered to determine whether Faul executed Deputy Marshal Cheshire, and if he passed the test, Faul would be permitted, without objection by the government, to introduce the polygraph results plus the results of a similar test conducted by the defense, if he took the stand subject to cross-examination.

The parties differ as to what interpretation should be given the agreement, but we need not resolve this dispute. The record reflects a misunderstanding between the parties; it does not reflect malice on the part of the government, nor does it demonstrate a violation of the defendant's due process rights. *See United States v. Dawkins,* 562 F.2d 567 (8th Cir.1977); *United States v. Millet,* 559 F.2d 253 (5th Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978).

**G. Sequestration of the Jury**

 Appellant Broer challenges the sequestration of the jury to the care of the United States Marshals Service. He claims that he was prejudiced because the marshals, by being cordial with the jurors, hampered his defense theory that it was the marshals who were the aggressors at the shootout. We reject this claim.

Initially we note that the jury was sequestered at the appellant's request. Further, there has been no evidence offered that shows the marshals discussed the trial with the jurors or attempted to influence the jury in any way. We believe the appellants were afforded nothing less than the due process to which they were entitled. *See Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Accordingly we find Broer's claim in this regard to be without merit.

**H. FED.R.EVID. 615**

 Broer asserts that the trial judge abused his discretion in allowing Agent Brubaker to assist the prosecution as a coordinator of nearly 50 witnesses. Appellant concedes he must show substantial prejudice, *see Government of the Virgin Islands v. Edinborough,* 625 F.2d 472, 474 (3d Cir.1980), and an abuse of discretion by the district court. *See Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). Broer claims that FED.R.EVID. 615(2) provides for one designated representative only, and that the district court abused his discretion in allowing two such representatives in this case.

We need not decide at this time whether an exception for two designated representatives is allowed under FED.R.EVID. 615(2), as it is clear that any error which may have resulted from the district court's ruling on this point was harmless. *See* FED.R.CRIM.P. 52(a).

**I. Sufficiency of the Evidence**

Broer also alleges that the evidence was insufficient to support his convictions. He claims that there was no evidence that he attempted to conceal Gordon Kahl, or that he was a part of a conspiracy to assault any federal officers.

In evaluating the sufficiency of the evidence to uphold a verdict, we must view the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences which may be drawn. *See United States v. Burchinal,* 657 F.2d 985, 996 (8th Cir.), *cert. denied,* 454 U.S. 1086 [102 S.Ct. 646, 70 L.Ed.2d 622] (1981); *United States v. Sullivan,* 618 F.2d 1290, 1295 (8th Cir.1980).

*United States v. Vitale,* 728 F.2d 1090, 1094 (8th Cir.1984). Viewing the evidence in the light most favorable to the verdict, it is clear the evidence was sufficient to support Broer's conviction for harboring and concealing Gordon Kahl.

■ The evidence showed that when Sheriff Kapp's surveillance was detected Broer called Chief Graf to inquire about the surveillance. He was directly involved in the plan to test the surveillance by moving the Kahl vehicle, as well as the attempt to disguise Gordon Kahl prior to leaving the clinic. He also participated in the decision to have Gordon Kahl switch places with Wegner in the automobile. All of this was done with the knowledge that a warrant for Gordon Kahl's arrest was outstanding. Finally, he was transporting Kahl in his vehicle immediately before the confrontation occurred, and attempted to turn the vehicle around when he saw the roadblock. This evidence was clearly sufficient to support his conviction under 18 U.S.C. § 1071.

■ A more troublesome issue is presented by Broer's conviction under 18 U.S.C. § 111, for conspiring to forcibly assault, resist, oppose, impede, intimidate, or interfere with the law enforcement officers attempting to arrest Gordon Kahl. The government correctly contends that proof of any of the means by which the statute was violated is sufficient to support the conviction. *See Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970); *Gerberding v. United States,* 471 F.2d 55, 59 (8th Cir.1973). Broer claims that under the instructions given it is impossible to discern whether all the jurors found any single allegation to have been proven. In essence his claim is that it must clearly be shown that the jury unanimously convicted him on at least one of the enumerated *means* of violating the statute. Appellant shows this court no authority for the position he espouses, and we have been unable to discern any on our own. It is clear, however, that Broer failed to object to the jury instructions given in this case, and absent a showing of plain

error he has waived his objection. *See United States v. Vitale,* 728 F.2d 1090, 1092 (8th Cir.1984).

In his brief, counsel for Broer argued that assault had to be proven; however, as stated above, any means stated in the indictment would have been sufficient. *See Turner, supra,* 396 U.S. at 420, 90 S.Ct. at 654; *Gerberding, supra,* 471 F.2d at 59. The issue now raised was not preserved, and we cannot say that this is the exceptional case where a plain miscarriage of justice would occur giving rise to a "plain error" determination. *See United States v. Shaw,* 570 F.2d 770, 773 (8th Cir.1978). *See also Vitale, supra,* 728 F.2d at 1092 (objections prevent error and alert the court to take corrective action, defendant cannot allow error to go uncorrected and then seek reversal of his conviction). Accordingly, we need not decide whether at least one of the means listed in section 111 had to be proven.

As to the sufficiency of the evidence claim, as stated above, the indictment charged Broer with conspiring to forcibly assault, resist, oppose, impede, intimidate, or interfere with the law enforcement officers attempting to arrest Kahl. The district court instructed the jury as follows:

When a statute provides several means or methods by which it can be violated and the indictment charges that a defendant utilized several of these means or methods, proof at trial of any one of the means or methods charged is sufficient to support a conviction even though all have not been proved.

Instruction 50.

. . . . .

Four essential elements are required to be proved in order to establish the offense of conspiracy charged in count eleven of the indictment:

First: That the conspiracy described in the indictment was willfully formed, and was existing at or about the time alleged;

Second: That the defendant willfully became a member of the conspiracy;

Third: That one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment, at or about the time and place alleged; and

Fourth: That such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.

Instruction 54.

■ In this case, when the evidence is viewed in the light most favorable to the verdict, including all reasonable inferences that may be drawn, we believe that the evidence was sufficient to support the verdict. *See United States v. Vitale, supra,* 728 F.2d 1090. Broer came to, and left the meeting armed. At the time he left the meeting not only was Broer armed, but he was aware that law enforcement officers were surveilling the clinic and that they wanted to arrest Gordon Kahl. The presence of the firearms, coupled with the other circumstances, some of which evince the harboring offense, clearly provide sufficient evidence of a conspiracy to forcibly resist, oppose, impede, or interfere with the officers in their attempt to arrest Gordon Kahl. The fact that Broer withdrew from the conspiracy prior to the shooting explains his acquittal on the substantive assault offenses, but is of no consequence as to the jury's verdict on the conspiracy count.

**J. Sentencing under 18 U.S.C. § 1071.**

■ Broer challenges his five year sentence under 18 U.S.C. § 1071, for harboring and concealing Gordon Kahl. 18 U.S.C. § 1071 provides:

Whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person, shall be fined not more than $1,000 or imprisoned not more than one year, or both; except that if the warrant or process issued on a charge of felony, or after conviction of such person of any offense, the punishment shall be a fine of not more than $5,000, or imprisonment for not more than five years, or both.

*Id.*

The question Broer raises is whether the harboring of Gordon Kahl—a convicted misdemeanant for whose arrest a warrant had been issued—constitutes a misdemeanor or a felony under section 1071. Broer claims that the five year sentence applies only if the warrant alleges a felony, or the person has been convicted of a felony, and that neither situation applies to Gordon Kahl.

Under section 1071 it is clear that the harboring of a person for whose arrest a federal warrant or process has been issued is a felony if the warrant or process was issued on a felony charge, or after the conviction of such a person for *"any offense."* 18 U.S.C. § 1071 (emphasis added). It is of no consequence that the prior conviction in on a misdemeanor rather than a felony charge, since the term "offense" includes both felonies and misdemeanors. Accordingly, we affirm Broer's sentence on the conviction for harboring and concealing Gordon Kahl.[12]

**IV. Conclusion**

We have examined the appellants' remaining arguments and find them to be without merit. Accordingly, the convictions are affirmed.

LAY, Chief Judge, dissenting.

I respectfully dissent. The record amply demonstrates the defendants did not and could not receive a fair trial in the District of North Dakota. At the time of trial there existed in that district "so great a prejudice against the defendant[s] that [they could] not obtain a fair and impartial

12. We note that our ruling today is limited to the situation where the offense for which the fugitive is sought is directly related to the crime—misdemeanor or felony—for which the fugitive was convicted, as is the case here.

trial at any place fixed by law for holding court in that district." Fed.R.Crim.P. 21(a).

The issue on review of a district court's ruling on a motion to change venue is whether the trial court has abused its discretion. *E.g., Rizzo v. United States,* 304 F.2d 810, 817 (8th Cir.), *cert. denied,* 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962). The district court in the present case, however, failed to rule on the defendants' venue change request. The usual deference to a district court's determination that a change of venue was unnecessary is thus not warranted in this case.

Regardless of whether the district court ruled implicitly or merely denied de facto a change of venue, the majority's analysis focuses incorrectly on constitutional principles. In federal court, a federal defendant's right to an impartial jury is protected under our supervisory authority.

The Supreme Court has considered in several cases the question of whether a trial court denied a defendant his due process rights in refusing to grant a change of venue. *See Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Each of these decisions, however, was a review of a *state* criminal prosecution. Because each defendant alleged a violation of his fourteenth amendment rights, the Court's analysis was necessarily constitutional in scope.

In determining whether a state criminal procedure is constitutionally defective, federal courts give great deference to the state tribunal's evaluation. A federal court generally will not interfere unless the factual context and trial procedure were so egregious as to demonstrate an inherent denial of due process. The Supreme Court presumed such due process denials in the *Sheppard, Estes,* and *Rideau* cases. *See also Murphy,* 421 U.S. at 798–99, 95 S.Ct. at 2035.

A more stringent standard governs the review of a federal district court's refusal to grant a change of venue under Fed.R. Crim.P. 21(a). Appellate evaluation of a denied change of venue request in a federal prosecution is based on " 'the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts,' and not as a matter of constitutional compulsion." *Murphy,* 421 U.S. at 797, 95 S.Ct. at 2035, *quoting Marshall v. United States,* 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959). *Cf. Marshall,* 360 U.S. 310, 79 S.Ct. 1171 (reversing, in the exercise of its supervisory power, defendant's federal criminal conviction where jurors were exposed to information detailing defendant's previous convictions). As the Supreme Court recognized in *Murphy,* criteria developed under federal supervisory powers to evaluate the fairness of a defendant's trial do not apply to the due process review of state criminal trial procedures. *See Murphy,* 421 U.S. at 798, 95 S.Ct. at 2035.[1]

Under the more protective federal standard, "jurors' assurances that they could

---

1. *See also Murphy v. Florida,* 421 U.S. 794, 803–04, 95 S.Ct. 2031, 2037–38, 44 L.Ed.2d 589 (1975) (Burger, C.J., concurring) ("Although I would not hesitate to reverse petitioner's conviction in the exercise of our supervisory powers, were this a federal case, I agree with the Court that the circumstances of petitioner's trial did not rise to the level of a violation of the Due Process Clause * * *."); *United States v. Provenzano,* 620 F.2d 985, 995–96 (3d Cir.), *cert. denied,* 449 U.S. 877, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Haldeman,* 559 F.2d 31, 145–50 (D.C.Cir.1976) (MacKinnon, J., dissenting), *cert.* *denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250, *reh'g denied,* 433 U.S. 916, 97 S.Ct. 2992, 53 L.Ed.2d 1103 (1977); *cf. Rideau v. Louisiana,* 373 U.S. 723, 728, 83 S.Ct. 1417, 1420 (Clark, J., dissenting) ("[I]f this case arose in a federal court, over which we exercise supervisory powers, I would vote to reverse the judgment before us. * * * It goes without saying, however, that there is a very significant difference between matters within the scope of our supervisory power and matters which reach the level of constitutional dimension.") (citations omitted).

maintain impartiality in spite of the news articles[,]" *Murphy v. Florida*, 421 U.S. 794, 797, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), do not, alone, answer a federal defendant's allegation that he or she could not have obtained a fair trial in a particular district. Rather, venirepersons' exposure to "information with a high potential for prejudice," *id.*, in combination with other factors discussed below, may justify a new trial or reversal of a defendant's conviction. This test is not a subjective evaluation by either the trial or the appellate court. The determination of potential prejudice under federal supervisory powers is an objective appraisal of many factors—not merely a post hoc analysis of the voir dire examinations.

Although Fed.R.Crim.P. 21(a) does not provide clear guidelines for evaluating prejudice in a federal prosecution, certainly the Rule presumes prejudice in extreme cases where "the totality of circumstances [indicates] that petitioner's trial was not fundamentally fair." *Murphy*, 421 U.S. at 799, 95 S.Ct. at 2036; *Cf. Marshall v. United States*, 360 U.S. 310, 311–12, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959) (using its supervisory power to grant a new trial where jurors were exposed to news articles containing information previously ruled prejudicial and inadmissible). The majority, however, limits its evaluation of juror prejudice to the voir dire examinations and the district court's admonitions of fairness to the prospective jurors.[2] Where heightened emotions related to the crime pervade the

general community, voir dire evidence of impartiality is not a sufficient guarantee of a fair trial. *See Murphy*, 421 U.S. at 799, 95 S.Ct. at 2035. Given the sensational character of the facts of this case, the jurors' indications that they could act as neutral fact finders are not an adequate assurance that the defendants Faul, Kahl, and Broer received a fair trial in the District of North Dakota. As the First Circuit Court of Appeals observed in *Delaney v. United States*, 199 F.2d 107, 112–13 (1st Cir.1952):

> One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity.

Review of the voir dire examination is but one factor in a review of a district court's denial of a motion for change of venue. Other factors should also be considered, such as the extent of circulation of publicity concerning the event in the community, the severity and sensationalism of the offense, the familiarity of the jurors with the individuals involved, the length of time between the publicity and the trial, the prospective jurors' exposure to the publicity, the connection of government officials with the release of the publicity, and the character and size of the district from which jurors will be selected.[3] Applying

---

**2.** Contrary to the majority's method of evaluation, the voir dire examination is not a factor of greater weight than other considerations. Indeed, factors such as community size and extent of publicity may reveal the unreliability of voir dire testimony. *See* American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Fair Trial and Free Press* 127 (1968).

**3.** State courts considering motions for changes of venue employ similar factors. Voir dire results are not the sole element in an analysis of the existence of potential juror prejudice. In *Houle v. N.D. Dist. Court, Burleigh County, S. Central Judicial Dist.*, 293 N.W.2d 872, 873 (N.D. 1980) (citations omitted), the Supreme Court of North Dakota stated:

Thus, the ultimate question to be decided by the court is whether or not it is possible to select a fair and impartial jury. The explanatory notes to Rule 21, N.D.R.Crim.P., list four factors to be considered by the Court in determining whether or not pretrial publicity renders it impossible to select a fair and impartial jury: (1) whether or not the publicity was recent, widespread, and highly damaging to the defendant; (2) whether or not the prosecution was responsible for the objectionable material, or if it emanated from independent sources; (3) whether or not an inconvenience to the prosecution and the administration of justice will result from a change of venue or continuance; and (4) whether or not a substantially better panel can be sworn at another time or place.

these considerations to the circumstances that led to the prosecutions of defendants Faul, Kahl, and Broer, I find it impossible to conclude that the defendants could have received a fair trial in the District of North Dakota.

The deaths that occurred during the February 13, 1983, confrontation were needless and tragic.[4] Outpourings of sympathy for the losses suffered by the families of the deceased Marshals came from across the nation. The issue in this case, however, is whether the living defendants, Scott Faul, age 29, Yorie Von Kahl, the 23 year-old son of Gordon, and 43 year-old David Broer received a fair and impartial trial. This question requires a recounting of the historical facts that led Gordon Kahl, his family, and followers to the bloody February 13 gun battle.

Gordon Kahl was a "tax protester" and a member of an extremist organization known as the Posse Comitatus. Kahl was convicted in 1977 in the federal district court for the Western District of Texas on two counts for failure to file income taxes. Kahl served a one-year sentence in Leavenworth Federal Prison and was placed on probation for five years. After serving his sentence, Kahl apparently returned to his North Dakota farm in 1979. In 1980, Kahl was summoned to appear in federal court on a charge that he had violated his probation in failing to file required monthly probation reports. In March of 1981, the United States Marshal for the District of North Dakota received a parole warrant from a district of Texas indicating that Kahl was in violation of his parole. After learning from Texas authorities that Kahl could be dangerous, the Marshal arranged a meeting with Kahl to attempt to resolve the matter peacefully.[5] The Marshal testified that he did not attempt to arrest Kahl at this "meeting of the minds." The meeting did not convince Kahl to submit voluntarily to the Marshal.[6]

On February 13, 1983, Gordon Kahl, the three defendants, and others were peacefully assembled at the Medina Medical Clinic in Medina, North Dakota. The group noticed that they were under surveillance. Scott Faul became uneasy, because he had information that an all points bulletin (APB) had been issued on his car. This APB was later determined to be an attempt to locate a car believed to have been used by Gordon Kahl. The group left the Clinic in separate cars, and soon encountered a roadblock created by unmarked police vehicles. When the defendants attempted to turn around in a driveway, they were blocked by a Ram Charger. Faul testified

---

This Court recently added four more factors to assist in judicial determinations of whether or not pretrial publicity warrants a change of venue. These additional considerations are: (1) the nature and gravity of the offense; (2) the size of the community; (3) the status of the defendant in the community; and (4) the popularity and prominence of the victim. *See also State v. Engel,* 289 N.W.2d 204, 206 (N.D.1980); *State v. Fallis,* 205 Neb. 465, 288 N.W.2d 281, 284 (1980); *Olson v. N.D. Dist. Court, Richland County, Third Judicial Dist.,* 271 N.W.2d 574, 579–80 (N.D.1978); *cf. State v. Thompson,* 266 Minn. 385, 123 N.W.2d 378, 380 (1963) (per curiam) *quoting State ex rel Warner v. Dist. Court,* 156 Minn. 394, 194 N.W. 876, 878 (1923) ("'... (sic) It is not necessary that * * * the ends of justice *require* the change. It is sufficient that they would be *"promoted."*'") (emphasis in original). The same factors should be considered in evaluating venue change motions under our federal supervisory powers. *Cf. St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.,* 474 F.2d 192, 198 (5th Cir.1973) ("For guides to the 'law of independent federal judicial decision,' * * * we look principally to federal decisions in nondiversity cases, but without blinders to persuasive analogies from state law.") (citation omitted).

4. The violence and killings did not end on February 13, 1983. Gordon Kahl and a local law enforcement officer were killed a few months later in another armed confrontation in Arkansas. *See United States v. Udey,* 748 F.2d 1231 (8th Cir. 1984).

5. The Marshal also sought out Kahl at a church meeting, but, deciding that the "circumstances were not [right]," did not attempt to arrest Kahl.

6. Deputy United States Marshal Harold C. Warren testified that Marshal Muir told him that Muir had been instructed by his superiors in Washington, D.C. to cease attempting to apprehend Gordon Kahl. Kahl's minor violation was not deemed worth the expense and time necessary to execute successfully the warrant for his arrest.

on direct examination that he did not recognize either the truck blocking his car as a police vehicle or the persons in the truck as police officers. Faul further testified "[s]omeone started screaming at us and the man that had the shotgun pointing at me yelled, 'your [sic] going to die,' and I was waiting and my head was pounding kind of like I could feel every heart beat and I thought everyone [sic] would be my last one." Transcript of Proceedings, Volume XIII at 175–76. Yorie Kahl gave similar testimony. Faul denied connecting the armed barricade with the outstanding warrant on Gordon Kahl. The gunfire began shortly thereafter.

From February 14, 1983, to March 29, 1983, the Fargo *Forum,* circulation 56,500, printed 68 news stories and 22 pictures related to the criminal matter in issue. Approximately one-third of these articles and pictures were on the front page. Television and radio coverage was extensive. Descriptions of Gordon Kahl's fanaticism, the violent and unique nature of the crime, and sympathy for the dead United States Marshals created feelings of hostility against the defendants. Marshal Muir was one of the most respected law enforcement officers in the area. Deputy Marshal Cheshire was also well-liked and respected. According to two news articles, a total of over 1100 people attended the funeral services of the Marshals. The cold-blooded killing of Cheshire heightened the agitation, not only in the small peace-loving farm community, but throughout the state. The Governor of North Dakota directed that all state, county, and local flags be flown at half-mast in remembrance of the two deceased Marshals. Funeral eulogies and editorials condemning the killings and paying tribute to Muir and Cheshire were printed in the district's largest selling newspaper. Anger and shock thus spread across the entire District of North Dakota.

Much of the publicity linked the defendants with Gordon Kahl's fanaticism and ruthlessness. Many news articles focused on Gordon Kahl's association with the radical Posse Comitatus, and left an impression that all the defendants were involved with the Posse Comitatus. Pre-trial Fargo *Forum* articles included in the record clearly demonstrate the media-created connection between the defendants and Gordon Kahl:

*2/14/83:* "Two U.S. marshals were killed * * * while trying to arrest a probation violator [sic]. * * * Gordon Kahl * * *. Police said they had arrested Kahl's son, Yorie * * *."

*2/15/83:* "[E]motionally charged meeting of civil liberty advocates * * * some members * * * headed into a shootout * * *. One of the fugitives * * * Scott Faul. * * Gordon Kahl * * * the other fugitive is known to have headed more formally organized posses * * *. Broer * * * drove away from the scene * * *."

*2/15/83:* "[H]unt for fugitives. * * * Gordon Kahl * * * a tax protestor [sic] and parole violator, and * * * Scott W. Faul. * * * Kahl's 23-year-old son, Yorivon, also is in government custody. * * * [A] known enclave for the tax protestor [sic] group that Kahl and the others are presumed to be members."

*2/15/83:* "[A] violent end to a trial that had led them astray of the law before, mainly because of their unconventional views about taxes. Both Gordon Kahl, 63, and Scott Faul, 29, have been found guilty of tax evasion. Acquaintances said Kahl and Faul threatened to turn violent * * *."

*2/15/83:* " 'They're still shooting out here... We need help' * * * Yorie Kahl, 23, who had bullet wounds in the stomach and arm * * * 'How can this happen in little Medina, North Dakota?' * * *."

*2/16/83:* "An assault * * * by about 100 heavily-armed law enforcement officers * * to find 63-year-old fugitive Gordon Kahl * * *. [J]ust hours after another suspect in the slayings, Scott W. Faul * * * surrendered to authorities. * * * The one suspect not being held in the jail is Kahl's 23-year-old son Yorivon, who was wounded * * *."

*2/16/83:* "Kahl house in shambles after search * * * Kahl is wanted in connection with a roadblock shootout with government

**1228**

officers * * * Kahl's son Yori, 23, [was] wounded * * *."

*2/16/83:* **"Shootout said to resemble TV gun battle** * * * [a local law enforcement officer] Kapp observed a car known to be driven by Gordon Kahl * * *. [The officers] spotted a car belonging to David Broer * * * 'The first shot fired, [stated the affidavit of one officer] was from Yorivon Kahl, which appeared to have hit Deputy U.S. Marshal Chesire.' * * * Faul * * * assisted Yorivon Kahl into Schnable's squad car * * *."

*2/16/83:* "Law enforcement officers, equipped with an armored personnel carrier and automatic weapons, were preparing to make a sweep of the Kahl farm to determine if the 63-year-old fugitive wanted in the slayings of two U.S. marshals was hiding somewhere on the property. * * * Yori Kahl, 23, suffered two bullet wounds in the abdomen in the shootout * * *."

*2/17/83:* **"Slain U.S. law officer eulogized."**

*2/17/83:* **"Sources say Kahl takes blame in letter** * * * Suspects being held * * * are * * * David R. Broer * * *. Kahl's son, Yorivon * * * remains under armed guard at the Jamestown hospital. The 63-year-old Kahl, who has been characterized as a 'fanatic' antitax protestor [sic] * * * [T]he letter surfaced with Scott W. Faul * * * another suspect in the slayings * * * Kahl * * * has been described as being a member of a paramilitary group called Posse Comitatus * * *."

*2/16/83:* "Mrs. Kahl, wife of Gordon Kahl, the remaining fugitive among six people charged with the deaths of two federal marshals, broke into tears when she referred to her 23-year-old son, Yorivon, who was wounded in the incident."

*2/18/83:* "Two lawmen are dead and others in the Medina, N.D., shootout lie in hospitals, some seriously wounded. The region and the nation are in shock over what happened last Sunday * * * Who would have thought that an attempt to serve a warrant on a man wanted for pro-

bation violation in a federal tax case could result in such havoc." (*Forum* editorial).

*2/18/83:* "Dozens of heavily-armed law enforcement officers swept into Ashley, N.D., Thursday morning in another futile search for fugitive Gordon Kahl * * * Kahl was active in a group called Posse Comitatus * * * The wounded· suspect, 23-year-old Yorivon Kahl, Gordon Kahl's son, was removed from the critical list * * *."

*2/19/83:* **"Search for shootings' fugitive continues** * * * Five people with Kahl when the shootings occured, including his wife and son, have been arrested."

*2/19/83:* **"Hearing for five suspects in shooting tentatively set** * * * The five suspects include fugitive Gordon Kahl's * * * 23-year-old son Yorivon * * * Scott W. Faul * * * and David R. Broer * * * A sixth suspect, Gordon Kahl * * * remains at large * * *."

*2/20/83:* "Kahl has claimed to be a member of the paramilitary tax-protest group, Posse Comitatus * * * Five people with Kahl, including Yorivon * * * were arrested on murder charges. The other three [include] Scott Faul * * * and David Broer * * *."

*2/21/83:* "The task of finding fugitive Gordon Kahl, a tax protester accused in the slayings of two U.S. marshals, has settled into routine investigative work * * * Kahl has been hunted since a brief gunbattle near Medina following a meeting of people sharing similar beliefs as Kahl, * * * David Broer and Faul have been charged with murder."

*2/22/83:* "Kahl, a tax protester and probation violator, is the subject of a search in several western and midwestern states * *. Five other people are in custody in connection with the slayings, including * * * his critically wounded son, Yorivon Kahl * * * David Broer * * * and Scott Faul * * *."

*2/23/83:* **"Faul accused of 'executing' deputy marshal** * * * during a 15-second gun battle with tax protester Gordon Kahl and five other suspects * * *."

*2/23/83:* "Law enforcement officers found themselves at a tactical disadvantage just

prior to the shootout on Feb. 13, near Medina, N.D., with tax protester Gordon Kahl and five other suspects. * * * Reardon said Faul then walked over to the vehicle where Cheshire lay wounded and upon reaching it, fired two shots at Cheshire."

*2/24/83:* "**Yorie Kahl formally charged in Jamestown hospital room** * * * Kahl is the son of fugitive tax protester Gordon Kahl * * * [P]reliminary hearings for four other defendants * * * [including] Scott Faul * * * and David Broer * * *."

*2/24/83:* "Kahl, whom federal law enforcement officers have identified as a key figure in the formation of posse units in central North Dakota, is being sought for the slaying of two U.S. marshals during a Feb. 13 shootout near Medina, N.D."

*2/28/83:* "**Manhunt for fugitive Kahl enters third week** * * * His 23-year-old son Yorie is hospitalized * * * and awaits a preliminary hearing on a murder charge. Four persons are in jail * * *."

*3/1/83:* "[N]o new developments in the search for fugitive Gordon Kahl * * * Being held without bond are Scott Faul, 29, and David Broer * * *. Gordon Kahl's 23-year-old son, Yorivon, remains under protective custody * * *."

*3/2/83:* "**Yori Kahl moved to Clay County jail** * * * Kahl is the son of fugitive Gordon Kahl, 63, a tax protester from Heaton, N.D. Gordon Kahl still is being sought by federal and state authorities."

*3/3/83:* "**Court delays hearing for Yori Kahl** * * * Kahl, 23, is the son of fugitive tax protester Gordon Kahl * * * The search for Gordon Kahl is in its third week. The U.S. Marshal Service has offered a $25,000 reward for information leading to his arrest."

*date* *: "**Details of alleged Kahl letter revealed** * * * Kahl also praised the actions of his 23-year-old son Yorie Von Kahl and Scott Faul, during the gun battle."

*3/10/83:* "Yorie Von Kahl, admitted he may have fired the first shot in the gun battle between tax protesters and law enforcement officers on Feb. 13 * * * Kahl,

the son of fugitive Gordon Kahl * * * Two others facing the murder charges * * are Scott Faul, * * * and David Broer * * Kahl's father also has been charged with murder and remains the subject of an intensive manhunt."

*3/12/83:* "**Grand jury indicts Kahl, five others** * * * The 11-count indictment charges Kahl, 63, his son Yorie Von, 23, and Scott Faul, 29, with the murders * * * David Broer, 43, on lessor [sic] charges * * *."

*3/13/83:* "One month after a shootout that left two U.S. marshals dead, tax protester Gordon Kahl is still at large, and investigators blame his freedom on factors including sympathy for the 63-year-old fugitive. Kahl and five other people were indicted Friday * * * Of the five indicted, only Kahl * * * is still at large."

*3/15/83:* "**Medina shooting suspects arraigned** * * * Yorie Von Kahl * * * Scott Faul * * * and David Broer * * * A sixth suspect, Gordon Kahl, * * * also has been charged with murder. He remains the subject of an intense manhunt * * *."

*3/19/83:* "A federal judge in Texas had issued a warrant for Kahl's arrest in March 1981, and it was that warrant marshals unsuccessfully attempted to serve on Kahl nearly two years later. Instead of an arrest, a 15-second gunfight erupted, leaving two marshals dead and four others, including Kahl's 23-year-old son, Yorie Von Kahl, wounded."

*3/19/83:* "Both Faul and the younger Kahl were arrested shortly after the incident and have been charged with murder. The elder Kahl also faces murder charges but remains a fugitive."

*3/24/83:* "**Description of** [Gordon] **Kahl's car released** * * * Three others have also been charged with murder in the slayings of U.S. marshal[s] * * * They were cut down by bullets as they tried to serve an arrest warrant on Kahl * * *."

*3/26/83:* "Radio conversations transcribed by authorities have left a chilling record of the minutes preceeding the Feb. 13 shootout * * * The officers were trying to arrest fugitive Gordon Kahl * * * Kahl's ve-

---

* Indicates the date of the article was not found in the record.

hicle was spotted outside the Medina Medical Clinic, where an informal group of so-called 'constitutional activists' was meeting * * * Kahl, 63, his son Yorie, 23, and Faul, 29, all of Heaton, have been indicted by a federal grand jury on two counts of murder."

*3/26/83:* "**Judge asked** [by prosecutor] **to bar some subjects at shootout trial** * * * Evidence concerning membership in anti-government, anti-tax or anti-law enforcement groups, such as Posse Comitatus * * by Gordon Kahl or any other defendants. * * * [Yorie] Kahl and Faul have been charged with the murders of [Cheshire and Muir] * * * The three other defendants who have been charged with lesser offenses [include] * * * David Broer * * * A sixth suspect, who also is facing murder charges, Gordon Kahl * * * remains a fugitive. * * * [The prosecutor] acknowledged he may be premature in anticipating what evidence the defendants will attempt to offer at the trial. But he noted that several of the defendants have been portrayed in news media accounts as being tax protesters and members of vocally anti-government and anti-tax groups such as Posse Comitatus * * * In particular, [he] noted a 16-page statement purportedly written by Gordon Kahl in which Kahl claims a religious right to resist arrest for any tax-related offenses. '* * * [P]ublic news stories indicate that perhaps several of the other defendants may share at least some of Gordon Kahl's views,' * * *.'"

*3/27/83:* "**Posse leader says 'task force' investigating shootout coverup** * * * Although Kahl is still at large, federal authorities have arrested five others in the case."

The origin of and responsibility for the February 13 armed confrontation was a significant issue in the case.[7] Although reasonable jurors could and did find that Faul, Kahl, and Broer were guilty of second degree murder, assault, and conspiracy, the evidence was not overwhelming. I accept the factual findings of the jury. I believe, however, that those findings were tainted by prejudice that prevented the defendants from receiving a fair trial in the emotion-charged District of North Dakota.

The majority admits the news coverage was widespread but characterizes the media treatment as "largely factual in nature." This ignores the totality of circumstances. The emotionalism running through this rural district caused even "factual" reporting to fan the flames of the community's shock and anger. In this case the violence of the crime, the small town character of the community, and the connection made between all of the defendants and extremist protest groups should have been considered in the evaluation of whether the defendants received a fair trial.[8] As the American Bar Association Project on Standards for Criminal Justice observed:

> There are * * * difficulties with [a court denying a motion for change of venue

---

7. Two witnesses, a husband and wife who drove through Medina on February 13, testified that a police officer pulled them over and told them "there was going to be a shoot-out and this time the police were in the wrong." Transcript of Proceedings, Volume XIII, at 66, 85. Another witness, a local Medina man who was near the scene of the shootout, verified that a law officer told him, "there is a tax evader up there and now they are going to shoot him." Transcript of Proceedings, Volume IX, at 212–13.

8. As a factor in our supervisory review of the district court's denial of the defendants' motion for change of venue, an examination of the voir dire testimony reveals the impact of the pre-trial publicity concerning this case. Explaining why he had followed closely the news reports of the Medina incident, one excused venireperson testified:

> Well, you know, you hear about this in other states and, but North Dakota it's unusual and I just couldn't believe something like that would happen.

Transcript of Proceedings, Vol. II, at 125. A second voir dire examination, typical of the testimony of those excused, further demonstrates the influence of the extensive media coverage:

> Q: Is there anything about the report of these cases, this case, that caused you to have a special interest in it and thereby to follow news reports relating to it?
> A: It was big news, crime against the federal agent.
> Q: You considered it to be big news and as such, and because of the nature of the incident, it is something that—
> A: Yes.
> Q: —caused you to follow the reports relating to it?

where a jury meets prevailing standards of impartiality]. [M]any existing standards of acceptability tolerate considerable knowledge of the case and even an opinion on the merits on the part of the prospective juror. And even under a more restrictive standard, there will remain the problem of obtaining accurate answers on *voir dire*—is the juror consciously or subconsciously harboring prejudice against the accused resulting from widespread news coverage in the community? Thus if change of venue * * * [is] to be of value, [it] should not turn on the results of the *voir dire;* rather [it] should constitute [an] independent [remedy] designed to assure fair trial when news coverage has raised substantial doubts about the effectiveness of the *voir dire* standing alone.

American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Fair Trial and Free Press* 127 (1968).

"Substantial doubts" have been raised about the effectiveness of the voir dire examinations as a barometer of jury impartiality in this case. Under any standard of review, the district court wrongly failed to grant the defendants' request for a change of venue. In the exercise of this court's supervisory powers, the defendants' convictions should be vacated and a new trial should be granted in a district remote from that of North Dakota.

A: Yes.

Q: Has anything that you have heard or read about this case in following these reports caused you to form an opinion as to the innocence or guilt of any of the defendants in the case?

 \* \* \* \* \* \*

A: Yes, sir. It's a very strong opinion.

 \* \* \* \* \* \*

Q: You feel if you were selected as a juror in the case it would be very difficult for you to set aside or disregard the opinion that you have formed?

A: Yes, sir.

*Id.* at 171–72.

Each of the chosen jurors also was exposed to the extensive news coverage. Several of the jurors actually subscribed to the *Forum.* One of the selected jurors admitted that at an earlier date his "mind [was] pretty well set," *id.,* at 91, although he did not claim to have any opinion at the time of the voir dire examination. Anoth-

er selected juror also testified that he had formed an opinion, albeit "nothing that I would consider a strong opinion." Transcript of Proceeding, Vol. III, at 165.

The majority's statement that only 27% of the jurors attributed their partiality to media coverage is misleading. The majority admits that of the 114 original venirepersons, twenty-eight were excused before voir dire on the basis of hardship. Another venireperson was excused for hardship later in the proceeding and four others were never considered. Seventy-eight prospective jurors actually underwent voir dire. Thirty-nine, or one-half, were excused as potentially partial due to pretrial publicity or knowledge of persons involved in the prosecution. This statistic should be a factor considered in an evaluation of defendants' request for a change of venue. Indeed, even if the analysis was limited to a review of the voir dire examinations, a 50% partiality rate sufficiently demonstrated the need for a change of venue in this case.