UNITED STATES of America, Appellee,

v.

Michael ROTH, Appellant.

UNITED STATES of America, Appellee,

v.

Marvin ROTH, Appellant.

Nos. 83–1983, 83–1984.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1984.

Decided June 12, 1984.

Rehearing and Rehearing En Banc Denied July 17, 1984.

Arthur S. Margulis, St. Louis, Mo., for appellant Michael Roth.

Thomas E. Dittmeier, U.S. Atty., Kevin F. O'Malley, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before ROSS, JOHN R. GIBSON and BOWMAN, Circuit Judges.

ROSS, Circuit Judge.

Michael Roth and Marvin Roth, unrelated codefendants, were indicted by a grand jury for making an extortionate extension of credit, using extortionate means to collect or attempt to collect an extension of credit, and conspiring to use extortionate means to collect or attempt to collect an extension of credit, in violation of 18 U.S.C. §§ 892, 894 (1976). The defendants were tried before a jury and found guilty on each count contained in the indictment. The district court[1] sentenced Michael Roth to fifteen years imprisonment on each count, with the sentences to run concurrently, and imposed a fine of $20,000. Marvin Roth was sentenced to twenty years imprisonment on each count, with the sentences to run concurrently, and was also fined $20,000. The defendants appeal their convictions alleging that several errors were committed by the district court. Appellants invoke this court's jurisdiction under 28 U.S.C. § 1291 (West Supp.1983). For the reasons stated herein we affirm the convictions.

**FACTS**

Jacque Farache, borrowed $30,000 from Aaron Pultman in November 1981. The loan was for the term of one year with interest owing at thirteen percent per month for the first six months, and eleven percent for the last six months. Pultman was the nephew of Marvin Roth, and was Michael Roth's partner in a restaurant establishment known as Bagel & Brew, in St. Louis.

On July 6, 1982, Pultman was arrested in connection with a major drug transaction. Subsequently he was indicted by a grand jury for his involvement in the transaction. The day following the indictment he was found dead in an abandoned automobile. After Pultman's death, Marvin Roth viewed documents at Pultman's home and found evidence that Farache owed Pultman $30,000.[2]

On August 3, 1982, approximately 10 days after the discovery of Pultman's body, Farache received a telephone call concerning the repayment of his loan from Pultman. The caller stated that there was a debt of approximately $42,000 "on the books," consisting of $30,000 principal and $12,000 interest. Farache was told that he had 30 days to repay the debt which would be collected "one way or another."

Immediately after receiving this call, Farache contacted Detective Hegger of the St. Louis Police Department and advised him of what had transpired. Farache had been an informant for Detective Hegger

---

1. The Honorable Kenneth H. Wangelin, United States District Judge for the Eastern District of Missouri.

2. Unbeknownst to the Roths, Farache had repaid approximately $10,000 of the $30,000 debt at the time of Pultman's death.

since 1980 when he was arrested on drug charges.

Approximately two weeks later Farache received a second and third call to arrange a payment schedule. It was eventually agreed that payments of $3,000 per month would be made against the indebtedness. During these conversations Farache talked to the original caller and "his superior."

Farache again notified Detective Hegger of the calls. Hegger provided Farache with a tape recorder to record future telephone conversations, and had Southwestern Bell place a line identification device on Farache's phone to register the originating number of all incoming calls.

On August 23, 1982, Farache received a call originating from Michael Roth's restaurant. The caller instructed Farache to deliver the first $3,000 payment to a man named Frank at Barnes Hospital in St. Louis.

Equipped with a body recording device Farache went to Barnes Hospital to deliver the $3,000 payment. Officers of the St. Louis Police Department surveilled the meeting, and observed Farache hand the payment to a man later identified as Robert Jackson. Marvin Roth was observed driving away from the scene with Jackson.

Farache received additional calls regarding the loan during the early part of September. All of the calls originated from Michael Roth's restaurant. Police officers posing as customers corroborated the timing of these calls, and identified Michael Roth as the caller.

On September 17, Michael Roth phoned Farache and told him that a payment was expected that day at the "same place." Later that day Farache delivered $1,000 to Jackson, and explained that he could not raise the $3,000 that had been requested.

At this time special agents of the Federal Bureau of Investigation (FBI) applied for and received a court order authorizing the installation of a pen register device on the private telephone at the Bagel & Brew Restaurant. A pen register device records the date, time, and duration of outgoing telephone calls placed from the telephone to which it is attached. The pen register device on the Bagel & Brew telephone became operational on September 21 and continued in operation through November 2.

Michael Roth telephoned Farache again on September 29, to arrange for an October 1 payment. Farache did not have the money to make the payment, and, therefore, did not meet with Jackson as scheduled. Special agents of the FBI observed Marvin Roth and Jackson at the Barnes Hospital payment location, and followed them as they returned to Michael Roth's restaurant.

Michael Roth telephoned Farache to discern why he had not made the payment. Farache insisted that he should not have to continue to make payments since the money had been "lost" as a result of a previously successful police narcotics investigation. Michael Roth indicated to Farache that Aaron Pultman "felt the same way." Farache then asked for different payment terms, but Michael Roth said he was without authority to make those kinds of decisions. Marvin Roth subsequently rejected the idea of discharging the entire indebtedness for a reduced sum.

Officers in the restaurant observed the Roths and Jackson talking shortly after the telephone call. At that time Jackson volunteered to talk to Farache about the indebtedness. On October 5, Jackson and a friend, John Pluff, met with Farache. Several threats were made against Farache, and he was visibly shaken by this encounter.

Shortly after this incident Jackson was approached by the FBI and agreed to cooperate with the government. He made no further pickups for the Roths.

On November 1, Farache received another call from Michael Roth, and arrangements were made for a payment to be delivered at Lambert International Airport. That evening Farache delivered $500 to Marvin Roth, who was then arrested. Thereafter, Michael Roth was arrested.

## ISSUES

On appeal both defendants claim that the district court erred in admitting Robert Jackson's testimony regarding his agreement with the government, and in allowing the government to use documents which had not been furnished to the defendants. Marvin Roth raises three additional allegations of error. He claims that the district court erred in denying his motion for severance, in admitting the telephone conversations of his codefendant, and in imposing an excessive sentence.

## DISCUSSION

### A. Admission of Coconspirator's Guilty Plea

At trial Robert Jackson testified extensively as to his participation with the Roths in the scheme to collect the loan. During the direct examination of Jackson the government sought to elicit testimony from Jackson regarding his agreement with the government. The following exchange took place:

Q. (By Mr. Dowd) Tell us whether or not the Government promised you that you would be charged with only one count of conspiracy to extort funds in this case?

MR. LONDON: May we approach the bench?

(The following occurred at the bench outside the hearing of the jury.)

MR. LONDON: I'm going to have to object, Your Honor. I'm going to object to this line of questioning. He has now injected into this case that the witness has agreed to plead guilty to conspiracy to extort money which is the very charge in this trial before this jury. And I move that it be stricken and the jury instructed to disregard it, and a mistrial be declared. How could this jury be asked to pass upon this with an open mind when the Government now is leading their own witness and bringing the ultimate issue?

THE COURT: Of course, he's the fellow that's making the contacts. I'm going to allow you to—let's avoid leading so much. He has already testified that

he made an arrangement with the authorities; is that right?

MR. LONDON: He testified, not only that, it was an arrangement with respect to extortion.

THE COURT: You may ask him what that agreement was.

MR. DOWD: Okay.

(The following occurred within the hearing of the jury.)

Q. (By Mr. Dowd) Mr. Jackson, what was your agreement with the Government?

A. The agreement was that I not make any further pickups and that I would only be charged with one count of conspiracy.

Q. Okay.

A. And that the prosecutors would let the sentencing judge, make him aware of my cooperation.

The appellants contend that this testimony was highly prejudicial.

■ Ordinarily, one person's guilty plea or conviction may not be used as substantive evidence of the guilt of another. *See United States v. Wiesle*, 542 F.2d 61, 62 (8th Cir.1976). However, evidence that a codefendant has pled guilty to the same offense is not error unless elicited as substantive proof of the defendant's guilt. Such evidence is clearly admissible to show the witness's acknowledgement of participation in the offense, or to reflect on his credibility. In such circumstances the jury should be instructed that the evidence is received for this purpose alone, and that they are not to infer the guilt of the defendant. *See Wallace v. Lockhart*, 701 F.2d 719, 725–26 (8th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983).

■ In this case no limiting instruction was given by the trial court, however, defense counsel did not request one, nor did they object to its absence. Furthermore, in light of the overwhelming evidence of guilt in this case, we believe the error, if any, to be harmless and no reversible error was

committed. *See Gerberding v. United States,* 471 F.2d 55, 60 (8th Cir.1973).

The appellants rely on *United States v. Fleetwood,* 528 F.2d 528 (5th Cir.1976), wherein the court held that the government's emphasis on a witness's guilty plea was manifestly prejudicial. The court espoused the following guidelines for determining whether such evidence requires reversal:

> In evaluating the impact of a witness' guilty plea "we must carefully examine all the facts and circumstances of the case in their proper context. The presence or absence of [a limiting] instruction is an important factor, but it is also essential to consider other factors, such as whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, whether the introduction of the plea was invited by the defense counsel, whether an objection was entered or an instruction requested, whether the defendant's failure to object could have been the result of tactical considerations, and whether, in light of all the evidence, the failure to give an instruction was harmless beyond a reasonable doubt".

*Id.* at 532 (citation omitted). Even under the analysis employed in *Fleetwood* the appellants are not entitled to the requested relief.

■ As discussed above, while an objection was made to the admission of Jackson's testimony regarding his agreement with the government, no request was made for a limiting instruction, nor was an objection made to the absence of one. Furthermore, unlike *Fleetwood,* the government in this case did not improperly emphasize the testimony, or attempt to use it as substantive evidence of guilt. Rather, it was the defense counsel that first used the term "guilty," and emphasized this testimony during the cross-examination:

> Q. [By Mr. London] Let me ask you, sir: Mr. Dowd asked you if you had entered into some sort of an agreement with the Government whereby you would be charged and *plead guilty* to something; is that right, sir? (Emphasis added.)
>
> A. That's correct.

Finally, the government explained at oral argument that it sought to disclose Jackson's cooperation and the agreement in order to diffuse any attempt by the defendants to show bias on cross-examination. We agree that this is a legitimate purpose. *Cf. United States v. Wiesle, supra,* 542 F.2d at 63 (defendant attempted to establish a deal between government and witness). Under the facts and circumstances presented in this case we hold that any error committed by the district court was harmless beyond a reasonable doubt. *See* FED.R.CRIM.P. 52(a).

## B. Admission of Evidence Not Furnished to the Defense

■ On the last day of trial, Michael Roth testified on direct and cross-examinations that the only loan he had made to Aaron Pultman was for $25,000 in late January or early February of 1982.[3] On cross examination Michael Roth was confronted with a note dated January 3, 1983, which showed a $46,000 loan from Michael Roth to Pultman. He then testified that he found this note after Pultman's death, signed it, and took it to an attorney in Kansas City for the purpose of collecting the loan he had made to Pultman. He also testified that he found a note for $90,000 from Pultman to Marvin Roth, and that Marvin had subsequently signed the note and gone to Kansas City with him to see the attorney.

The appellants argue that the government should have disclosed these documents under Federal Rule of Criminal Procedure 16.[4] We reject the appellants' argument.

---

**3.** During the noon recess the FBI had delivered promissory notes signed by Pultman and the Roths to the United States Attorney. The FBI had obtained the notes earlier that day from an attorney in Kansas City, Missouri.

**4.** In pertinent part the rule provides:

> **(C) Documents and Tangible Objects.** Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, docu-

This court has recognized that discovery matters are within the sound discretion of the district court, and are reviewable only upon a showing of an abuse of discretion. *See United States v. Vitale,* 728 F.2d 1090, 1093 (8th Cir.1984). An error by the district court in administering the discovery rule is reversible error only if the error is shown to prejudice the substantial rights of the defendant. *Id.* In this case we cannot say that the trial court abused its discretion or that substantial rights of the defendants were prejudiced.

■ Rule 16 requires that the documents be "intended for use by the government as evidence in chief at the trial, or [be] obtained from or belong to the defendant." FED.R.CRIM.P. 16(a)(1)(C). Here the notes were used for impeachment purposes and were not offered in the government's case in chief, nor were they a critical element in the government's case. Additionally, the notes were neither "obtained from," nor did they "belong to" the appellants, as required by Rule 16. Finally, the appellants were not substantially prejudiced by the use of the notes as each was aware of the existence of the notes prior to their use by the government. Accordingly, we hold that the district court did not abuse its discretion nor were any substantial rights of the defendants prejudiced.

## C. Severance

■ Marvin Roth alleges that the district court erred in denying his motion for severance. He contends that he was prejudiced as a result of this ruling, because there was no evidence that he had placed any of the telephone calls to Farache that were admitted against Michael Roth, and because his defense differed from his codefendant's.[5]

In *United States v. Brim,* 630 F.2d 1307 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981), in addressing a similar argument, we stated:

> In ruling on a motion for severance the district court weighs the inconvenience and expense of separate trials against the prejudice resulting from a joint trial of codefendants. The question whether there is prejudice warranting severance is addressed to the sound discretion of the trial court * * *.
>
> Brim is required to show prejudice. A mere showing that defendant would have a better chance of acquittal in a separate trial is not sufficient to require severance. * * * Indeed, *absent a showing of clear prejudice, joinder of defendants charged with conspiracy is preferred* where proof of the charges is based on the same evidence and acts.

*Id.* at 1310 (citations omitted, emphasis added).

It is true that the recordings were of telephone conversations between Farache and Michael Roth, and that Marvin Roth was not directly mentioned by name. However, the government's theory was that Marvin Roth was the unnamed person that Michael Roth referred to in the conversations as being "in charge." Furthermore, the telephone conversations were circumstantial evidence of the conspiracy.

---

ments, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of his defense *or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.*

\* \* \* \* \* \*

**(c) Continuing Duty to Disclose.** If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or in-

spection under this rule, he shall promptly notify the other party or his attorney or the court of the existence of the additional evidence or material.

FED.R.CRIM.P. 16(a)(1)(C) & (c). (emphasis added).

5. Michael Roth testified that he was "playing a role" with Farache because he was afraid of Farache and thought this was the safest manner by which to collect the debt. Marvin Roth did not testify.

The Roths were charged with a common conspiracy. The acts which form the bases for these charges were identical. Furthermore, it was Marvin Roth who recruited Jackson to make the pickups. Marvin Roth was present at each of the collection meetings, corroborating his involvement in the events planned during the telephone conversations. Michael and Marvin Roth participated together in the events that constituted the offense. On these facts, there is no indication that the district court abused its discretion in denying the motion to sever. *See United States v. Reeves*, 674 F.2d 739, 746 (8th Cir.1982); *United States v. Boyd*, 610 F.2d 521 (8th Cir.1979), *cert. denied*, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980); *United States v. Phillips*, 607 F.2d 808, 810–11 (8th Cir.1979).

### D. Admission of Coconspirator's Statements

■ Marvin Roth claims that no threat was made to Farache prior to October 5, when Jackson and Pluff went to speak to Farache at his place of employment. He contends that any conversations between Michael Roth and Farache prior to that date were hearsay, and not within the coconspirator exception to the hearsay rule. *See* FED.R.EVID. 801(d)(2)(E). The appellant's theory is that until a threat was made there was no conspiracy to extort, and, therefore, the conversations were not in furtherance of the conspiracy charged.

In *United States v. Bell*, 573 F.2d 1040 (8th Cir.1978), we stated:

> [A]n out-of-court statement is not hearsay and is admissible if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course and in furtherance of an illegal association to which the declarant and the defendant were parties.

*Id.* at 1044. *See* FED.R.EVID. 801(d)(2)(E).

The evidence shows that when Farache was telephoned on August 3, 1982, he was told that the debt would be collected "one way or another." We believe that the district court could reasonably construe this comment as a threat evincing the beginning of the conspiracy. Furthermore, Marvin Roth's involvement in the attempt to collect the money "one way or another" was shown early on in the scheme by his presence at the payment location. Additionally, the evidence showed that the note was discovered by Michael and Marvin Roth together. We are persuaded by the totality of the evidence that the district court did not err in finding that the recorded conversations took place during the course of the conspiracy. Accordingly, we hold that the statements were properly admitted.

### E. Excessive Sentence

■ Marvin Roth contends that his sentence is excessive punishment disproportionate to the crime charged. While an appellate court has authority to review the severity of a sentence, a sentence within the statutory limits is generally not disturbed. *See United States v. Bangert*, 645 F.2d 1297, 1306 (8th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 314, 70 L.Ed.2d 158 (1981); *United States v. Moss*, 591 F.2d 428, 438 (8th Cir.1979). In this case the sentence given was within the statutory maximum. This court will not "substitute its judgment for the discretion committed solely to the district court." *United States v. Hollis*, 718 F.2d 277, 279 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984). The district court did not abuse its discretion in this case.

### CONCLUSION

We have examined the appellants' remaining arguments and find them to be without merit. Accordingly, we affirm their convictions.