UNITED STATES of America, Plaintiff–Appellee,

v.

Larry C. DAVIS and John Newsome, Defendants–Appellants.

Nos. 86–1772, 86–1773.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1987.

Decided Jan. 25, 1988.

Lee T. Lawless, Fed. Public Defender's Office, St. Louis, Mo., Thomas H. Boswell, Carbondale, Ill., for defendants-appellants.

Michael C. Carr, Asst. U.S. Atty., Benton, Ill., for plaintiff-appellee.

Before COFFEY and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

MANION, Circuit Judge.

Defendants–Appellants, Larry Davis and John Newsome, appeal their convictions for conspiring to distribute more than 1,000 pounds of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. We affirm.

## I.

## BACKGROUND AND PROCEEDINGS IN DISTRICT COURT

Larry Davis and John Newsome were charged with participating in a large marijuana distribution ring operating in southern Illinois from April, 1977 through November, 1983. The government's theory of the case was that Jack Hrvatin, the "kingpin" of the conspiracy, was the central figure of a large marijuana distribution network. On one side of the network, "sources" supplied marijuana to other members of the conspiracy. On the other side, "buyers" purchased the marijuana and, in turn, sold the marijuana to smaller distributors or to marijuana users. Many of the conspirators performed different roles within the conspiracy—acting as either "sources" or "buyers" depending on the circumstances.

In September of 1985, a grand jury indicted Davis, Newsome and twelve other persons. The indictment charged all the defendants with conspiracy to distribute more than 1,000 pounds of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846.[1] The indictment also named several persons as unindicted co-conspirators, including Jack Hrvatin.

Before trial, ten of Davis' and Newsome's co-defendants pleaded guilty. Davis and Newsome were then jointly tried with the two remaining co-defendants, Larry Bowen and Dave Bullock. Larry Bowen was accused of acting as a source of marijuana for Jack Hrvatin and other members of the conspiracy. Dave Bullock was accused of acting principally as a "buyer" from Douglas Hatchett, a marijuana dealer and unindicted co-conspirator.

At trial, the government's case, like many drug conspiracy cases, relied heavily on the testimony of the defendants' former

---

1. 21 U.S.C. § 841 provides:
   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance....
   21 U.S.C. § 846 provides:

   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

associates. Most of these former associates had agreed to cooperate with the government after either pleading guilty to drug charges, being convicted of drug charges, or being granted immunity from prosecution. Two of these witnesses were indicted along with Davis and Newsome and had pled guilty. Others were involved in separate prosecutions on related charges. See *United States v. Marks*, 816 F.2d 1207 (7th Cir.1987). All told, 14 of the 18 witnesses the government presented at trial were involved in some aspect of the conspiracy and eleven testified pursuant to some type of an agreement with the government.

Through the testimony of these witnesses, the government elicited abundant evidence of Davis' and Newsome's guilt. Davis' role in the conspiracy was that of a "stash house" operator. The government's primary witness against Davis was Tim Norton. Norton testified that he, along with his partner Larry Bowen, was a major source of marijuana for Jack Hrvatin. Norton stated that Bowen and he stored marijuana at two different houses in which Davis lived and that Davis received a cut of the profits from their sales. Norton testified that in the fall of 1978 a dealer from Florida delivered 50 pounds of marijuana to him at Davis' house in Carbondale, Illinois. Norton stored the marijuana elsewhere even though Davis had agreed to allow Norton to store the marijuana at Davis' house and distribute it from there.

Norton then testified that in "approximately November of 1979" he had three or four bales of marijuana (each weighing 35 to 40 pounds) delivered to and stored at Davis' house in Carbondale. Davis was present during the delivery. Approximately a week to ten days later, Norton had another 250 pounds of marijuana delivered to Davis' house.

Later on, Davis resided at a farmhouse in DeSoto, Illinois. Norton testified that in April of 1982 he stored 5,000 pounds of marijuana at that farmhouse. The 5,000 pounds were delivered in two shipments and Davis assisted in transportation and unloading. Davis also helped guard and collect money for the marijuana. Of the 5,000 pounds, approximately 4,400 to 4,500 pounds were delivered to Jack Hrvatin.

Tim Norton's testimony concerning Davis' "stash house" operations was corroborated by many other witnesses. Jack Hrvatin testified that in 1980 he purchased a bale of marijuana at Davis' house on New Era Road in Carbondale. Hrvatin also testified that the 5,000–pound load of marijuana was stored at Davis' house in DeSoto and that Davis assisted in unloading the marijuana. One of Hrvatin's deliverymen, Sydney Hall, testified to helping unload the large load of marijuana with Davis and others at the DeSoto farmhouse.

Doug Hatchett, an unindicted co-conspirator, testified that in May, 1982, he received a call informing him of the availability of a large quantity of marijuana. Hatchett then went to the farmhouse in DeSoto where he saw a large quantity of marijuana being stored. He subsequently purchased some of the marijuana and received assistance from Davis in loading the marijuana into his car. Another marijuana dealer, Carl Hottes, testified that in 1979 he purchased 15 pounds of marijuana from Larry Bowen at Davis' house in Carbondale.

Davis did not testify. Instead, he attempted to counter the government's case through evidence designed to cast doubt on the testimony of the government's witness. Davis' cousin (who was allegedly present during the delivery of some of the marijuana) testified that he was often at Davis' house in Carbondale and did not witness any marijuana-related activities. One of Davis' co-workers testified that Davis vacated the house in Carbondale in October of 1979; this testimony was apparently intended to create doubts as to Norton's testimony that he stored marijuana there in "approximately November of 1979."

A friend of Davis testified that she lived near the DeSoto "stash house" and visited the house approximately once a month. She testified to not seeing any marijuana-related activities at the house. Similarly, Davis' father testified that he kept live-

stock at the DeSoto farm and that he was not aware of marijuana-related activities.

Newsome's role in the conspiracy was as a regular buyer of marijuana from Hrvatin. Jack Hrvatin testified that Newsome was a regular customer of his. According to Hrvatin, his sales to Newsome were in five-to-ten-pound quantities. Judy Hrvatin, Jack Hrvatin's wife, testified that Newsome was a ten-pound-per-week customer of her husband. Four of Jack Hrvatin's "deliverymen" testified at trial that they delivered marijuana to Newsome during the times alleged in the indictment. One of the deliverymen testified that between 1977 and 1980 he delivered five-pound quantities to Newsome on 47–57 occasions. Another witness, Doug Hatchett, also testified that he delivered marijuana to Newsome.

Newsome admitted buying marijuana in amounts ranging from approximately five to ten pounds but claimed that his purchases were more sporadic than the government's witnesses had testified. While claiming to be a heavy user of marijuana, he admitted that he sold much of the marijuana he purchased. He also admitted knowing that Hrvatin sold to others. His defense was that he was not aware of any "plan" between Hrvatin and others to distribute large quantities of marijuana.

At the conclusion of all the evidence, the jury returned guilty verdicts against all four defendants. Davis and Newsome appeal on several grounds.

## II.

## ANALYSIS

### A. Single Conspiracy v. Multiple Conspiracies.

We first address Davis' and Newsome's contention that the proof at trial fatally varied from the indictment. The indictment charged Davis and Newsome with participation in a single, ongoing conspiracy that operated from April, 1978 through November, 1983. Davis and Newsome contend that the evidence produced at trial fatally varied from the indictment because the government proved multiple conspiracies at trial. According to defendants, the

partnership of Tim Norton and Larry Bowen was Hrvatin's only source of marijuana. Norton testified that Bowen and he left the marijuana business from the fall of 1978 to late 1979 and again from the fall of 1980 to the fall of 1981. Thus, Davis and Newsome argue, the government proved only that three series of transactions occurred, not a single ongoing conspiracy. Even though the district court gave an instruction on single and multiple conspiracies, the defendants claim they are entitled to reversal because no evidence supported the government's single conspiracy theory. They contend that the allegedly fatal variance of the proof from the indictment allowed the government to introduce a great deal of prejudicial evidence of crimes unrelated to them. See United States v. Jackson, 696 F.2d 578, 584 (8th Cir.1982), cert. denied, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983).

In reviewing whether a single or multiple conspiracy was established after a defendant's conviction at trial, an appellate court must consider the evidence in the light most favorable to the government. United States v. Towers, 775 F.2d 184, 189 (7th Cir.1985). To establish a single conspiracy, the government must show that the "co-conspirators ... 'knowingly embraced a common criminal objective.'" United States v. Boucher, 796 F.2d 972, 975 (7th Cir.1986) (quoting United States v. Ras, 713 F.2d 311, 314 (7th Cir.1983)). However, the parties involved in a conspiracy do not have to know the other conspirators or participate in every aspect of the conspiracy. United States v. Noble, 754 F.2d 1324, 1329 (7th Cir.), cert. denied, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); Ras, 713 F.2d at 314. A conspiracy may have a small core of people with whom other conspirators knowingly participate to achieve the common purpose of the conspiracy. See Noble, 754 F.2d at 1329. "As long as the conspiracy continues and its goal is to achieve a common objective, ... parties may still be found guilty even though they join or terminate their relationship with the core conspirators at different times." Id.

Here, the evidence adequately supported the government's position that a single conspiracy existed. Davis' and Newsome's argument is based on the claim that the only source of Hrvatin's marijuana was the partnership of Norton and Bowen. This contention is completely at odds with the record. The government established that Hrvatin regularly purchased and sold marijuana throughout the time period charged in the indictment. Hrvatin had other sources of marijuana, most notably Steven Antonacci and Michael Dempsey. Hrvatin described Antonacci as a "major source" of his marijuana. Moreover, after Norton quit selling marijuana in May of 1982, his former partner, Bowen, sold marijuana to Hrvatin on several occasions. In short, there was sufficient evidence from which a jury could conclude that Hrvatin was the center of an ongoing criminal enterprise. The fact that some individuals involved in the conspiracy may not have been continuously involved with the enterprise simply does not negate the existence of a single conspiracy. *See Noble*, 754 F.2d at 1328–29.

## B. *"Other Acts" Evidence Admitted Against Newsome.*

Although not charged in the indictment, the government submitted evidence at trial that Newsome bought and sold cocaine. Specifically, Judy Hrvatin (Jack Hrvatin's wife) testified that she purchased cocaine from Newsome; LaQuenta Hatchett (an unindicted co-conspirator whose husband Doug Hatchett was heavily involved in the conspiracy) testified that she picked up cocaine at Newsome's house; and Newsome testified on cross-examination that he purchased cocaine during 1979 and 1981 from Kathy Parker, who, along with her husband, was involved in drug transactions with other members of the conspiracy. Newsome objected to Judy Hrvatin's testimony and to the government's questioning of him about the cocaine sales on cross-ex-

amination. On both occasions, the district court instructed the jury that Newsome was only on trial for the crimes charged in the indictment and that the evidence of cocaine transactions could be used only for the limited proper purposes under Rule 404(b), such as to show knowledge and intent. Newsome contends on appeal that this evidence was irrelevant and was submitted only to show his bad character. To support his contention, Newsome points out that evidence concerning his cocaine purchases from Kathy Parker was elicited by the government during his cross-examination, after the government rested its case-in-chief. He further claims that, even if relevant, the evidence should have been kept out because the danger of unfair prejudice outweighed any probative value. As there was no objection to LaQuenta Hatchett's testimony and its admission was not plain error, we consider only Judy Hrvatin's and Newsome's testimony.

Under Fed.R.Evid. 404(b), evidence of other crimes, wrongs or acts may not be used to establish defendant's bad character or to show his propensity to commit the crime for which he is charged. "Other acts" evidence may be admitted into evidence, however, if:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ..., (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984) (citations omitted).

Under the *Shackleford* analysis, the district court did not abuse its discretion by admitting the evidence that Newsome bought and sold cocaine.[2] First, the evi-

---

2. Defendants claim that the district court's evidentiary rulings on the "other acts" evidence should not be entitled to any deference because there was no indication that the district court engaged in the type of inquiry set forth in

*Shackleford.* In reserving his ruling on defendants' motion *in limine* concerning the "other acts" evidence, however, the district court expressly stated that it would address the issues under the *Shackleford* analysis as the issues

dence tended to show Newsome's knowledge and awareness of the conspiracy. Although Newsome admitted purchasing and selling marijuana, he denied any knowledge of the conspiracy. He portrayed himself as a sporadic, smalltime purchaser of marijuana who smoked a good portion of his purchases. His cocaine purchasing and selling activities were probative of his knowledge of and involvement with other conspirators. *See United States v. Passarella*, 788 F.2d 377, 383–84 (6th Cir.1986); *see also United States v. Rodriguez*, 831 F.2d 162, 168–69 (7th Cir.1987). The fact that the government elicited some of this evidence after the government rested its case-in-chief does not mean the evidence was asserted for an improper purpose. Given Newsome's direct testimony concerning his lack of knowledge, the government was entitled to attempt to re-establish that issue during cross-examination. *See United States v. Chaimson*, 760 F.2d 798, 806 (7th Cir.1985).

The "other acts" evidence also meets the second and third steps of the *Shackleford* analysis. The evidence concerning cocaine purchases and sales among persons involved in the conspiracy during the time period alleged in the indictment is similar enough in time and place to be probative of Newsome's knowledge of relationships between the conspirators. *See United States v. Ismail*, 756 F.2d 1253, 1258–60 (6th Cir. 1985) ("other acts" evidence concerning hashish and cocaine transactions admitted in heroin conspiracy distribution trial); *see generally United States v. Falco*, 727 F.2d 659, 662–65 (7th Cir.1984). Both the marijuana and cocaine sales involved the sales of controlled substances among the same general group of persons. Also, evidence of the cocaine transactions was introduced through direct, eyewitness testimony, including Newsome's own testimony. This direct testimony satisfies the clear and convincing requirement. *See Chaimson*, 760 F.2d at 807–08.

Finally, the district court did not abuse its discretion in determining that the probative value of the evidence outweighed any prejudice to Newsome. A "trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of his firsthand exposure to the evidence and his familiarity with the course of the trial proceeding." *United States v. Liefer*, 778 F.2d 1236, 1244 (7th Cir.1985) (quoting *United States v. Levy*, 741 F.2d 915, 924 (7th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984)). Here, Newsome's knowledge of the conspiracy was the central issue at his trial and this evidence was probative on that issue. This evidence was not so inflammatory that the jury was likely to ignore the instructions given by the district court that the evidence could be used only for the limited purposes allowable under Rule 404(b). Accordingly, we conclude that the district court did not abuse its discretion by admitting the testimony concerning cocaine purchases and sales into evidence.

### C. *"Other Acts" Evidence Unconnected to Davis and Newsome.*

Davis and Newsome both contend that the district court committed reversible error by allowing the government to introduce "other acts" evidence that was unconnected to either defendant. In their briefs, defendants point to thirteen instances in which testimony concerning drug transactions not charged in the indictment and not connected to them was allowed into evidence. Eleven of the thirteen instances involved cocaine transactions. Only the three instances discussed above involved Newsome. None of the thirteen instances involved Davis. The defendants objected to the admission of testimony concerning seven out of the thirteen instances of cocaine transactions. With the exception of evidence that friends of Newsome smoked marijuana, the district court gave a cautionary instruction to the jurors each time the defendants raised 404(b) objections to

came up at trial. While the district court should have been more explicit during trial in setting out its reasoning behind admitting the

"other acts" evidence, the record sufficiently shows that the district court properly exercised its discretion before admitting this evidence.

the evidence of drug transactions.[3] On appeal Davis and Newsome each assert that the introduction of evidence of drug transactions by other members of the conspiracy denied them a fair trial. We disagree.

There is a strong public interest in jointly trying persons who participate in a common criminal enterprise. *United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir.), *rehearing denied*, 828 F.2d 426, *cert. denied*, — U.S. —, 108 S.Ct. 67, 98 L.Ed. 2d 31 (1987); *United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985). Joint trials avoid problems inherent in multiple proceedings, such as needless expenditure of judicial resources, and are most likely to give a jury the best perspective of all the evidence. *See Buljubasic*, 808 F.2d at 1263. Joint trials do, however, run the risk that a defendant may suffer some prejudice that would not exist if the defendant was tried alone. One of these risks is that the jury will hear evidence concerning one defendant that would be inadmissible as to other defendants. *Buljubasic*, 808 F.2d at 1263; *see also United States v. Figueroa*, 618 F.2d 934, 944–45 (2d Cir.1980). As such, before admitting "other acts" evidence in a joint trial, a trial judge must not only weigh the probative value of the evidence against the danger of unfair prejudice to the defendant against whom the evidence is introduced, but must also consider any possible "spillover" prejudice that may unfairly prejudice other defendants. *See United States v. Rosenwasser*, 550 F.2d 806, 808 (2d Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977).

Generally, a cautionary instruction will be sufficient to cure any unfair prejudice, *see Rosenwasser*, 550 F.2d at 808; however, if the evidence creates an unacceptably high inference of wrongdoing against another defendant, the district court should either exclude the evidence or sever the trials. *See Figueroa*, 618 F.2d at 945–47.

■ Here, the admission of the "other acts" evidence was not an abuse of discretion. The record gives no indication that the evidence was placed into the record to unfairly prejudice Davis and Newsome. Rather, the evidence addressed either the knowledge and intent of other co-defendants or placed the relationships of other conspirators in context. *See Passarella*, 788 F.2d at 383–84; *Chaimson*, 760 F.2d at 804–07; *Ismail*, 756 F.2d at 1258–60. More importantly, there was not a significant danger that the jury would apply this evidence against Davis and Newsome. The government's case clearly delineated Davis as a "stash house" operator and Newsome as a relatively small but regular buyer of marijuana from Hrvatin. It is very unlikely that the jurors would confuse what evidence applied to which defendant.[4] Moreover, when the defendants specifically objected to the evidence of drug transactions not charged in the indictment, the court admonished the jury that the evidence could only be used for the limited permissible purposes set forth in Rule 404(b) and that the defendants were on trial only for the acts charged in the indictment. (On other occasions, none of the defendants objected to the evidence or requested a

---

**3.** The only time the district court did not give a limiting instruction to a 404(b) objection was to questioning concerning individuals smoking marijuana cigarettes with Newsome. This challenge raised by Newsome is specious at best. This testimony came out on cross-examination of Newsome as part of his claim that he had a little help from his friends in polishing off the large quantities of marijuana he bought from Hrvatin. Evidence that friends helped him smoke his marijuana could only support his defense that he bought much of the marijuana for personal and social consumption.

**4.** In a related vein, Davis argues that the presence of the "other acts" evidence entitled him to have his trial severed from his co-defendants. Because no significant problem existed concern-

ing jury confusion over Davis' role in the conspiracy, the district court did not abuse its discretion in denying his motion for severance. *See Liefer*, 778 F.2d at 1248. Davis also contends that the district court committed error by admitting the "other acts" evidence because the government, despite a negative response to an earlier request, produced a list of "other acts" evidence immediately before trial. We see no abuse of discretion. Much of the evidence was not previously disclosed because it was only disclosed to the government shortly before trial and other evidence was already in the possession of the defendants. In any event, the only "other acts" evidence dealing specifically with Davis was kept out of evidence.

cautionary instruction and the admission of the evidence was not plain error.)[5] Finally, at the end of trial, the district court instructed the jury to consider the particular evidence against each defendant separately and to disregard the evidence not related to that defendant. To the extent any adverse inferences may have arisen concerning the "other acts" evidence, any problem was cured by these instructions.

### D. Convictions of Co-conspirators and Co-defendants.

Unfortunately for Davis and Newsome, their trial was something akin to a reunion for many of the people involved in the conspiracy. As noted earlier, the government presented eighteen witnesses, fourteen of whom were involved in the charged conspiracy or in other related illegal activities. All fourteen testified after either pleading guilty, being convicted of a related offense or receiving immunity from prosecution. Eleven testified pursuant to some type of agreement with the government. These witnesses presented damaging, eyewitness testimony concerning Davis' and Newsome's involvement in the conspiracy. On appeal, Davis and Newsome contend that they were unfairly prejudiced by the witnesses' testimony concerning their own convictions and the convictions of others.

■ The fact that a person may plead guilty to or be convicted of a crime may not be used as substantive evidence that another individual is also guilty of that crime. See United States v. Bryza, 522 F.2d 414, 425 (7th Cir.1975), cert. denied, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); United States v. Roth, 736 F.2d 1222, 1226 (8th Cir.), cert. denied, 469 U.S. 1058, 105 S.Ct. 541, 83 L.Ed.2d 429 (1984). However, such evidence may be properly admissible for other purposes, such as impeachment, or rebuttal of an issue raised by opposing counsel. See Bryza, 522 F.2d at 425; Roth, 736 F.2d at 1226. Even when properly admitting such evidence, however, a district court should normally instruct the jury that the evidence may only be used for limited purposes and may not be used as substantive evidence of another's guilt. See United States v. Ojukwa, 712 F.2d 1192, 1193–94 (7th Cir.1983). But admitting such evidence or failing to give a curative instruction does not ordinarily constitute plain error. Id. A defendant will usually waive the issue for purposes of appeal if he fails to object. "[P]lain error will '[o]nly be found in those rare instances in which other 'aggravating circumstances' have exacerbated the prejudice.'" Id. at 1194 (quoting United States v. DeLucca, 630 F.2d 294, 299 (5th Cir.1980), cert. denied, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed. 2d 819 (1981)).

In this case, the district court admitted testimony concerning the witnesses' convictions for the same or a related offense for which Davis and Newsome were on trial. The district court also allowed in testimony from witnesses that other persons, who did not testify at trial, were convicted of the same or related offenses for which Davis and Newsome were on trial. The defendants failed to object to much of this testimony. We consider each group separately.

(i) *Witness Testimony Concerning Their Own Convictions.*

■ We first address defendants' challenge concerning the testimony of unindicted co-conspirators who testified on direct examination that they had either been found guilty or pleaded guilty to the same or closely-related charges. Defendants did not object to the testimony of these witnesses at trial so they are left with the argument that the admission of this evidence by these witnesses was plain error. Admitting this evidence was not error,

---

5. The failure of the defendants to object to much of the evidence of cocaine transactions also leaves the defendants in a difficult position to argue that any error was reversible. Given the fact that they had waived any objection to the evidence in six instances, it would not seem, as a practical matter, that the admission of the

other instances would cause them any additional prejudice. Moreover, the admission of this evidence was entirely consistent with the defense strategy to portray the witnesses as unworthy of belief because of their drug dealings and convictions.

much less plain error. The government may properly bring out agreements to cooperate and the circumstances behind those agreements in order to blunt the impact of crossexamination and to avoid the impression that the government was concealing the information. *See United States v. Melton,* 739 F.2d 576, 578–79 (11th Cir.1984); *United States v. Veltre,* 591 F.2d 347, 349 (5th Cir.1979). Here, the evidence was properly introduced for that reason.

The government's case against Davis and Newsome relied primarily on the testimony from Davis' and Newsome's former associates, all of whom were involved in criminal activities. Apparently in anticipation of credibility attacks on these witnesses, the government mentioned in opening argument that many of its witnesses were involved in criminal activities and had been convicted. Instead of objecting to the government's statement, Davis and Newsome made clear in their own opening arguments that the character of the government's witnesses was going to be a central point of their defenses. They left no doubt that they intended to show that the government's witnesses were unworthy of belief because the witnesses were bad people and because their agreements with the government gave them a motive to testify falsely.

Davis' attorney stated in opening argument that:

> [We] believe the evidence will show that each and every one of the government's witnesses that we anticipate will testify against Mr. Davis is testifying for some reason.... [E]ach and every one of them has been offered something for themselves or for someone else that is near and dear to them and that they have a purpose and motive for testifying and that is to gain something for themselves. And because of that, we anticipate that the Court will instruct you that you are to weigh and evaluate their testimony more closely than you would the testimony of someone else.

> ... We also anticipate those people will either have stood trial and have been found guilty or have entered into plea agreements where they have admitted that they were involved in marijuana transactions and because of that, you are going to have to weigh their testimony more carefully than you would the testimony of somebody just off the street.

Newsome's attorney stated in his opening argument:

> I believe that ... [the government's witnesses] ... are all either convicted; that they are convicted drug dealers. They are drug users. They are heavy drug users. The evidence will show that they have used and abused drugs for years. The evidence may show that some of them have been treated for mental disorders.

> These people have made agreements with the government to testify in exchange for favorable treatment for themselves or the anticipation of favorable treatment.

Throughout the course of the trial, defendants' counsel vigorously challenged the credibility of the government's witnesses and explored their motives to testify. In addition to examining many of the witnesses' agreements with the government, defendants' counsel further attempted to impeach witnesses with evidence of perjury, adultery, drug abuse, mental illness and the making of death threats. Under these circumstances the district court did not abuse its discretion by allowing in evidence of these convictions. The government was entitled to blunt the impact of the defendants' cross-examination on this impeachment issue as well as to avoid the impression that it was concealing facts pertinent to the witnesses' credibility.[6]

---

**6.** We note that, in addition to being brought out during their own testimony, Jack Hrvatin's and Sydney Hall's convictions were also brought out in the testimony of other witnesses. Jack Hrvatin testified on direct that Sydney Hall had been convicted. John Newsome testified on cross-examination that Jack Hrvatin had been convict-ed. Jack Hrvatin's testimony that Hall had been convicted was not objected to and its admission was not plain error. The defendants did not object to the government's cross-examination of Newsome that elicited testimony concerning Jack Hrvatin's conviction. We need not determine whether this testimony was appropri-

The next testimony concerning convictions we must consider is the testimony of two indicted co-conspirators, George Spann and Chris Steeples. Spann and Steeples testified on direct examination that they had pleaded guilty to the conspiracy for which Davis and Newsome were also charged. Defendants objected. The district court admitted the testimony but instructed the jury that it could consider the guilty pleas only for limited purposes. Furthermore, at the end of trial the district court specifically instructed the jury to consider Spann's and Steeple's testimony with caution and that they could not consider the guilty pleas as evidence against the defendants on trial.

■ The district court did not err in admitting this evidence. As with the other witnesses who testified at trial, the government introduced Spann's and Steeple's guilty pleas into evidence to blunt the impact of cross-examination and to minimize the appearance that the government was withholding information. Furthermore, the district court's cautionary instructions limited any prejudicial effects of this testimony.

Davis and Newsome raise an additional challenge with regard to Spann's testimony. They contend that Spann's testimony was simply a "sham" to place his guilty plea before the jury and to cure any possible Sixth Amendment error caused when Nancy Poland, (a customer of Jack Hrvatin and unindicted co-conspirator) testified that Spann had been convicted.

The decision whether to admit evidence rests within the district court's discretion. Where a defendant claims that a witness's entire testimony is a "sham," great deference should be afforded the district court. The district court's familiarity with the proceedings leaves it in a far better position to assess such claims than a reviewing court. Here, we see no abuse of discretion. At trial, Spann's testimony helped to bolster the authenticity of records kept by Nancy Poland concerning her husband's marijuana transactions. Her records indicated that Ernest Poland had purchased 3,000 pounds of the 5,000-pound load that Tim Norton and Larry Bowen had stored at Davis' house. This provided unequivocal documentary support to establish that the conspiracy involved more than 1,000 pounds of marijuana. Spann's testimony concerning his purchases from the Polands helped to show that Nancy Poland's records reflected the Polands' actual dealings. Although circumstantial, Spann's testimony did have some probative value. This case is much different than the situation presented in *United States v. Aldaco*, 564 F.2d 706 (5th Cir.1977) where a recently convicted co-defendant was asked four questions on direct examination: her name, her age, her possession of heroin at the time of her arrest and her conviction by a jury. Here, unlike *Aldaco*, the witness had some usefulness to the government's case other than simply placing his conviction into evidence. Moreover, given the fact that Spann did not testify to having any relationship whatsoever with either Davis or Newsome and given the fact that there was no shortage of former associates with a direct relationship with Davis and Newsome testifying at trial, it is highly unlikely that the government expected to get any mileage out of Spann's conviction. Accordingly, we find no abuse of discretion.[7]

### (ii) *Convictions of Non–Testifying Witnesses*

Next, we must consider defendants' claim of error based on Nancy Poland's testimony that three of her customers, Larry Liefer, Jim Sharos, and Billy Barrow,

---

ate because any error was harmless. Testimony concerning Jack Hrvatin's conviction had already been appropriately allowed into evidence. Moreover, given Hrvatin's extensive testimony in open court about his marijuana dealing operations, the fact that he was convicted did not tell the jury anything that was not already obvious.

7. Like Jack Hrvatin's and Sydney Hall's convictions, evidence of Spann's conviction came out during the testimony of another witness (Nancy Poland) in addition to his own testimony. Given our conclusion that Spann's conviction was properly admitted into evidence during his own testimony, any error committed by admitting the additional testimony concerning the conviction was harmless.

were convicted of offenses related to those for which Davis and Newsome were on trial. None of these individuals testified at trial. One of these individuals, Larry Liefer, was named in the indictment as an unindicted co-conspirator. The district court allowed this testimony into evidence over defendants' objection but did give a limiting instruction.

■ The government contends that the evidence of these convictions was properly admitted to bolster Nancy Poland's testimony that she sold drugs to other people. In support of this proposition, the government cites to *United States v. Martinez*, 775 F.2d 31, 37 (2d Cir.1985). In *Martinez*, the Second Circuit held that it was permissible for a witness to testify that three prison guards had pleaded guilty to crimes after the witnesses' credibility was attacked by claims that he had fabricated allegations against the prison guards. *Martinez* is readily distinguishable from the present case. Unlike the witnesses' testimony in *Martinez* concerning the prison guards, Nancy Poland's testimony that she sold drugs to Liefer, Barrow and Sharos was not challenged by the defendants. There was simply an insufficient nexus between her testimony and any specific impeachment issue to justify the admission of testimony concerning her customers' convictions. While she was impeached concerning her motives to testify, there was no specific challenge to her testimony concerning the sale of drugs. As such, evidence of these convictions should have been excluded from evidence.

■ Although these convictions should not have been admitted, we conclude that the error was harmless. Error is harmless unless it " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The primary reason for keeping out evidence concerning other persons' convictions is to avoid the possibility that a jury may infer the defendant's guilt because he associated with guilty people. *See United States v. DeLucca*, 630 F.2d 294, 298–99 (5th Cir. 1980). This problem did not exist here. At trial, Nancy Poland did not testify as to any relationship between Davis and Newsome and herself, much less a relationship between either Davis or Newsome and her customers. Any inference of guilt by association is attenuated without any association.

Moreover, in order to impute guilt to Davis and Newsome, the jurors would have had to impute the customers' guilt to Nancy Poland and then to her source, Jack Hrvatin. Given Nancy Poland's and Jack Hrvatin's testimony concerning their own extensive dealings with marijuana, there simply could not have been any incremental prejudice caused by Nancy Poland's testimony concerning her customers. The record makes it abundantly clear that it was the overwhelming testimony of former associates against them that caused Davis' and Newsome's problems at trial, not the convictions of far-removed persons not alleged to have a connection with the defendants. Moreover, the district court's cautionary instructions to the jury obviated the slight chance that the jury would improperly use this evidence against Davis and Newsome.

The remaining convictions admitted into evidence and challenged on appeal are those of Pat Tharpe and Marshall Marks. Tharpe and Marks were customers of Jack Hrvatin. During the trial several witnesses mentioned that Tharpe and Marks were involved in marijuana distribution. On direct examination Jack Hrvatin testified that Marks had been convicted and, on two separate occasions, that Tharpe had been convicted. There was no objection to this testimony or request for a limiting instruction. Subsequently, during cross-examination, the government also elicited testimony from Newsome that Tharpe and Marks had been convicted. Defendants objected but the district court allowed the evidence to be admitted. The government claims that the evidence was properly admitted to impeach Newsome. Whether the convictions of Marks and Tharpe were properly admitted

at that point is a question we need not resolve. If there was error, it was harmless. At the time defendants objected to the testimony concerning Tharpe's and Marks' convictions, the jury had already heard testimony that Tharpe and Marks had been convicted. Defendants' previous failure to object had placed this testimony before the jury, and we do not believe this additional mention harmed either Davis or Newsome. This is particularly so given the fact that, in addition to the testimony concerning the convictions, there was uncontradicted testimony at trial that Tharpe and Marks were involved in such illegal activities.

### E. *Admission of Cash.*

As part of their agreements to cooperate with the government Jack Hrvatin and Sydney Hall agreed to turn over the proceeds of their illegal activities. Among these proceeds was $113,480 in cash that Hrvatin had "stashed" with three friends and $26,200 that Hall had "stashed" with a Dr. Horecker. Approximately $68,480 of Hrvatin's money was buried in the backyard of a friend in Bellevue, Illinois. Over defendants' objections, approximately $120,000 of this cash was physically admitted into evidence. The cash was in $1,000 bundles containing bills in denominations ranging from $5 to $100. After the cash was admitted into evidence the district court, without objection from the defendants, allowed the jury to inspect the container with the $26,200 in cash in it that Hall had left with Dr. Horecker.

On appeal, defendants argue that this evidence was erroneously admitted into evidence. They argue that this evidence is irrelevant, or if relevant, the danger of unfair prejudice substantially outweighed its probative value. The cash admitted into evidence was relevant. The large amounts of cash did go to show that Hrvatin and Hall were involved in a large-scale marijuana conspiracy. *See United States v. Magnano,* 543 F.2d 431, 437 (2d Cir.1976), *cert.*

*denied,* 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *United States v. Tramunti,* 513 F.2d 1087, 1105 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed. 2d 50 (1975). The fact that Hrvatin and Hall were involved in other criminal activity that may have contributed to the amount of cash goes only to the weight, not the admissibility, of the evidence.[8] *See United States v. Viserto,* 596 F.2d 531, 536 (2d Cir.) (rejecting defendants' contention that proof of substantial cash expenditures in narcotics conspiracy was irrelevant because of defendants' claim that cash came from illegal gambling), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *Tramunti,* 513 F.2d at 1105 (in narcotics case "[t]he suggestion that ... large amounts of cash were from another illicit activity, loan-sharking, goes only to weight, not admissibility, of the evidence").

The problem with this evidence is that, within the context of the evidence at the trial, its probative value was extremely slight. Hrvatin and Hall, as well as an FBI agent, testified that this cash was handed over pursuant to an agreement with the government. Both Hrvatin and Hall were quite forthcoming with their extensive testimony concerning their involvement in the marijuana distribution conspiracy. The defendants presented no real challenge to either of these points. Thus, the cash itself was cumulative evidence of a very weak sort that probably should have been excluded under Rule 403's provision for the exclusion of cumulative evidence.

Given the cash's tenuous relevance, it would not take a great deal of unfair prejudice to substantially outweigh its probative value for purposes of Rule 403. The probative value of the cash, however, was so slight that there was not much danger of unfair prejudice. By the same token, even if the evidence should have been kept out under Rule 403, the admission of the cash was harmless. The cash was clearly presented as belonging only to Hrvatin and Hall. While the sight of $120,000 in cash

---

**8.** On appeal the defendants also argued that there was no evidence to show that this money was not from any of Hrvatin's legitimate business ventures. Hrvatin and Hall, however, both testified that the cash was from illegal activities.

was undoubtedly an unusual occurrence for the jurors, we do not think the evidence swayed the jurors to be prejudiced against Davis and Newsome. Testimony at trial involved much larger numbers than the $120,000 admitted into evidence. Norton testified that he sold 5,000 pounds of marijuana at approximately $265 per pound, and Hrvatin testified that some of his transactions over a two-year period involved nearly $2,000,000. Although the amount of cash was an unusual sight for jurors, the sight of cash itself (unlike, for example, the sight of a victim of a gruesome murder) is an everyday occurrence. Given the large amounts of cash involved in drug transactions and the size of this conspiracy, the presence of large amounts of cash connected with Hrvatin and Hall could not have surprised the jurors. Accordingly, if there was error in admitting this evidence, the error was harmless.

The defendants also challenge the fact that the container containing $26,200 of this cash was tendered to the jury. Frankly, we can see no permissible reason why the container with the cash was tendered to the jury. There was no claim that the cash was not what it was purported to be. What the container (or the cash) felt like could be of no possible relevance to the outcome of this matter. There was no objection to the tender of the cash to the jury, however, and the tender of the cash was not plain error. Exposure to cash (although not such large amounts) is an everyday occurrence and the tendering of the cash to the jury could not have had any greater effect on the jury than the sight of the cash itself.

### F. *Fair Trial.*

Finally, Newsome contends that he was denied a fair trial. Newsome claims that the trial was directed more towards showing that he was a bad person than to showing that he conspired to distribute large amounts of marijuana. We disagree. As discussed above, there was overwhelming evidence showing that, while a minor cog, Newsome was heavily involved in Hrvatin's conspiracy. His claimed lack of awareness of the conspiracy fell short in light of the

evidence, particularly in light of the evidence that he was a long-time purchaser and seller of marijuana, and that he knew Hrvatin sold to others. Moreover, most of the claims of error Newsome makes on appeal were meritless or not objected to below. In addition, whether or not erroneously admitted, much of the evidence (*e.g.,* convictions and "other acts" evidence) was entirely consistent with the strategy of all the defendants to paint the government's witnesses as drug dealers unworthy of belief because they were bad people whose agreements with the government gave them a real incentive to be commit perjury.

We do not take lightly the government's presentation of the cash or the convictions of the nontestifying witnesses. The only function this evidence served was to give the defendants strong, although ultimately unmeritorious, arguments on appeal. With the testimony of fourteen former associates of the defendants, we cannot surmise why the government chose to jeopardize its overwhelming case with such tenuous, yet potentially prejudicial evidence. Within the context of this case, we have concluded that any error was harmless. In other cases, such evidence may well be the difference between affirmance and reversal of a conviction.

### III.

### CONCLUSION

None of the grounds of error asserted by the defendants warrant reversal of their convictions. The judgments of conviction are

AFFIRMED.